**INTEL CORPORATION., a Delaware corporation, Plaintiff,**

v.

**VIA TECHNOLOGIES, INC., a Taiwan corporation, and VIA Technologies, Inc., a California corporation, Defendants.**

**No. C 99–03062 WHA.**

United States District Court, N.D. California.

Dec. 5, 2001.

Henry A. Petri, Jr., John F. Lynch, Arnold White & Durkee, Houston, TX, Joseph Kattan, Gibson Dunn & Crutcher, Washington, DC, James F. Valentine, Howrey Simon Arnold & White, LLP, Menlo Park, CA, Marc G. Schildkraut,

Howrey Simon Arnold & White, LLP, Washington, DC, for Intel Corp.

Robert P. Feldman, Leo Cunningham, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, John S. Ferrell, Carr & Ferrell LLP, Palo Alto, CA, for VIA Technologies, Inc., Taiwan Corp., VIA Technologies, Inc., California Corp.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT AND OTHERWISE DENYING CROSS–MOTIONS FOR SUMMARY JUDGMENT ON ENFORCEABILITY OF UNITED STATES PATENT NO. 5,926,651

ALSUP, District Judge.

### INTRODUCTION

■ This patent-infringement action presents the important question of law whether patent applicants who knowingly and deceptively withhold material prior art from the Patent and Trademark Office during prosecution are immunized from the doctrine of patent unenforceability in the event the examiner eventually finds cumulative prior art without ever finding the withheld art. Two Federal Circuit decisions are close precedents but point in virtually opposite directions. In reconciling these precedents, this order holds that an applicant who suppresses prior art with the *requisite intent* will be immunized only if the reference found is the reference withheld and cannot invoke blanket immunity merely because a cumulative reference was eventually discovered by the examiner on his or her own. For the reasons stated below, however, a fact issue remains on the issue of intent. Partial summary judgment is therefore **GRANTED** and the remaining fact issue shall be tried.[1]

### STATEMENT

The '651 patent is entitled "Output Buffer with Current Paths Having Different Current Carrying Characteristics for Providing Programmable Slew Rate and Signal Strength." The invention is discussed in greater length in the claim construction order dated June 29, 2001, and the concurrent order on VIA's motion for summary judgment for non-infringement.

Computers (and other devices) use buffer circuits to send electronic signals. The impedance of the circuitry fed by an output is known as a load. Drive strength is the amount of output current (also called signal strength) delivered by a buffer to the load. Slew rate is the slope of a signal, or time rate of change of a signal's voltage. A buffer may be called upon to drive different loads with different impedances. Impedance is a complex measure of opposition to current. In its simplest case, impedance is equal to ordinary resistance in ohms. As stated, the impedance of various loads usually varies from load to load. Matching the drive strength and slew rate of a buffer to the impedance of a load is desirable. Matching minimizes unwanted signal oscillation, which is harmful to timing and signal reliability. All other things being equal, increasing the amount of drive strength also normally increases the slew rate. The invention is a buffer circuit in which the drive strength and slew rate can be varied *independently* to match the impedance of a load.

---

1. This motion is but one of several in this action. Currently pending is Intel's motion for summary judgment on certain defenses and VIA's motion for summary judgment of non-infringement. The Court will hear another set of motions for summary judgment regarding another patent-in-suit, United States Patent No. 5,051,622, on December 13, 2001. Summary judgment was already granted in favor of VIA on its express-license defense for United States Patent No. 6,006,291.

The invention has three components: a logic circuit that tests the impedance of the load, a pre-driver, and an output driver. Both the pre-driver and output driver consist of a number of transistors connected to a voltage source. The logic circuit generates three signals: EN0, EN1, and OPSR.[2] The signals EN0 and EN1 enable separate groups of transistors in the output driver. By controlling which transistors in the output driver are operative, EN0 and EN1 control the drive strength because as more transistors are enabled, more current is delivered. Similarly, OPSR enables transistors in the pre-driver. The more that are enabled, the faster the signal arrives at the output driver. OPSR thus provides separate control over the slew rate.

As stated in the claim construction order dated June 29, 2001, the key features of the '651 patent are that both drive strength and slew rate can be varied independently, and that drive strength and slew rate are selected based on a logic circuit that tests the impedance of the load.

Intel has asserted Claim 1, which reads:

1. An output buffer circuit comprising a logic circuit for calculating a load impedance;

a plurality of switching devices for connecting a voltage to an output terminal; and

circuitry for enabling selected ones of the plurality of switching devices in accordance with a logic signal from the logic circuit, the selected ones of the plurality of switching devices selected in accordance with the load impedance to control slew rate and signal strength;

a plurality of different current paths having different current carrying characteristics for providing a slew rate for the switching devices in response to the logic circuit indicating the load impedance.

To summarize the earlier claim construction, the logic circuit tests the impedance of the load and generates the signals EN0, EN1, and OPSR based on the results of the test. The plurality of switching devices refers to the output drivers. The enabling circuitry refers to circuitry responsive to the signals generated by the logic circuit that enables or disables the output-driver transistors. The plurality of current paths refers to the pre-driver.

### 1. The '651 Patent Application.

The application for the '651 patent was filed on July 28, 2001. At the time, it was entitled "Output Buffer with Programmable Slew Rate and Strength." There were three named inventors. All were Intel employees. No prior art was cited by the applicants. No prior art was cited by the applicants at any point during the prosecution.

There were 16 proposed claims. Proposed Claim 1 read:

An output buffer circuit comprising

a first plurality of switching devices for connecting a voltage of a first level to an output terminal,

a second plurality of switching devices for connecting a voltage of a second level to the output terminal, and

a source of signals for enabling selected ones of the first plurality of switching devices in response to output signals of a first value and for enabling selected ones of the second plurality of switching devices in response to output signals of a second value.

As seen above, unlike the claim that eventually issued, proposed Claim 1 did not

**2.** The specification only discusses three signals by way of example. In practice, a larger number of signals could be used for increased control.

include a limitation for separate control over slew rate and did not explicitly require that the "source of signals" base the signals on the impedance of the load. Similarly, proposed Claim 6 read:

An output buffer circuit for furnishing signals to a load comprising:

a plurality of output devices for providing output signals to a load, and

means for varying buffer drive strength of the output devices in response to different load conditions for the buffer circuit.

Proposed Claim 6 likewise lacked any limitation for separate slew-rate control. None of the proposed independent claims recited such a limitation. Proposed Claims 9 and 10, which depended on proposed Claim 6, however, respectively claimed a "means for providing a slew rate for the output devices to match characteristics provided by the load" and "current paths . . . and means for testing load characteristics to provide signals to select ones of the current paths," similar to the current paths and logic circuit that eventually became part of Claim 1.

### 2. The '824 Michelsen Patent.

United States Patent No. 5,387,824 was filed on June 21, 1991, and issued to Jeffery Michelsen on February 7, 1995. It was entitled "Variable Drive Output Buffer Circuit." The abstract stated that it was directed to a buffer in which each of the output drive circuits was "selectively individually enabled or disabled to select the optimum number of output drive circuits which are operated in parallel to supply the drive signal . . . ."

The '824 Michelsen Patent disclosed a buffer in which the drive strength could be controlled by enabling or disabling transistors in output drive circuits based on the "enable signals" EN1 and EN2. These signals could be generated by a circuit "de-signed to detect the actual number of cards in the expansion slots of the computer" (Col.5:66–6:2) or "a software routine run to determine how much system memory" was installed (Col.6:64–66). The summary of the invention explained that "enabling circuit devices are provided, each corresponding to a different one of the CMOS circuits" (Col.2:54–56) and that "[t]he enabling circuit devices, in turn, are controlled by manual or software controlled logic to select the number of CMOS circuits required for matching the load connected to the output terminal" (Col.2:59–62).[3]

### 3. The Inventors.

The lead inventor of the '651 patent was Robert Jamie Johnston. The other two named inventors were Tuong Trieu and Sachidanandan Sambandan. As stated, all were Intel employees. During the pendency of this action, a copy of the '824 Michelsen Patent was produced from Mr. Johnston's files. On each page of the patent was an upside-down fax header reading: "AUG–14–1995." That date was 17 days after the application for the '651 patent was filed.

Mr. Johnston testified that he saw '824 Michelsen Patent, but did not remember when he saw it (Johnston Dep. 52, 200). According to Mr. Johnston, he became aware of '824 Michelsen Patent after someone put it on his chair at work (*id.* at 54). He testified that he did not know who placed it there and never tried to find out who did (*id.* at 57). He found it odd, however, that someone had left it on his chair (*id.* at 202–03). According to him, he kept it because he "had never seen a patent before" and "thought it was kind of interesting" (*id.* at 54–55). The only part of the '824 Michelsen Patent that he remembered reviewing in any detail was the

---

**3.** The cites in this paragraph are to the '824 Michelsen Patent.

cover page (*id.* at 204). He testified (*ibid.*):

Q: Did you look through it?

A: I remember glancing quickly at it.

Q: Just the cover page, or did you look at any of the other pages?

A: The only thing I remember looking at in any detail was the cover page. This page here.

Q: Do you remember flipping it open and looking through any of the rest of it?

A: I don't remember going through the rest of it, no.

Q: You just don't recall?

A: I don't recall. . . .

Q: Did you review the abstract?

A: I don't remember.

Mr. Johnston testified that it never occurred to him to mention the '824 Michelsen Patent to anyone involved with the prosecution because the '824 Michelsen Patent did "not contain the combination of drive strength, independent drive strength and slew rate control" (*id.* at 236). He testified that if he believed that he had claimed a buffer in which only the drive strength was programmable, he would have brought the '824 Michelsen Patent to the attention of his patent attorney (*id.* at 238–39). In reviewing the original claims at his deposition, however, he conceded that none of proposed Claims 1–6 claimed separately-programmable slew-rate control (*id.* at 216–17, 231–32).

Mr. Sambandan testified that he did not remember seeing the '824 Michelsen Patent until this litigation began (Sambandan Dep. 77). Mr. Trieu, however, testified that in 1995, Mr. Sambandan called him to discuss the '824 Michelsen Patent (Trieu Dep. 37). Subsequently, according to Mr. Trieu, Mr. Sambandan faxed Mr. Trieu a

copy of the '824 Michelsen Patent (*id.* at 38). Mr. Trieu remembered "looking at it" (*id.* at 39). When Mr. Trieu was asked why Mr. Sambandan faxed him the '824 Michelsen Patent, the following exchange occurred (*id.* at 38):

Q: And do you know why he faxed it to you in 1995?

A: He wanted to make me aware of it.

Q: And why was that?

A: He wanted to make me aware of it. I don't know why.

Q: Do you have any understanding of why he wanted to make it available or make you aware of it?

A: He just wanted to make me aware of it. I don't know why.

According to Mr. Trieu, he passed the patent on "to the next appropriate person" (*id.* at 39). He did not, however, remember whether he provided it to Mr. Johnston or to Stephen King, the attorney who prepared the patent application (*id.* at 39, 47).[4] Mr. Trieu recalled "wanting to make those who were involved with the filing of our patent application to be more aware of this information" (*id.* at 47).

**4. The Attorneys.**

Stephen King, the attorney who prepared the '651 patent application, testified that it was his practice not to conduct prior-art searches because he asked the inventors about the prior art instead (King Dep. 47). He further testified that if an inventor provided him with prior art, it was his habit to keep it in his personal file, but that he had no evidence that any of the inventors provided him with any prior art in connection with the '651 patent application (*id.* at 48). At the time of his deposi-

---

**4.** At some point Judith Szepesi took over the prosecution, but it is not clear exactly when. She responded to the first office action.

tion, he had no recall of having ever seen the '824 Michelsen Patent (*id.* at 5).

Judith Szepesi, who took over prosecution of '651 patent, testified that she did not conduct prior-art searches in working on Intel's patent applications because Intel asked her not to do so (Szepesi Dep. 23). It was her practice not to conduct prior-art searches after an application was filed because "that's what we pay the Patent Office for" (*id.* at 24).

### 5. Prosecution History.

The first office action occurred in April 1997, almost two years after the application was filed. As stated, no prior art had been cited by the applicants. The examiner rejected all the proposed claims as obvious in light of United States Patent Nos. 4,309,630 ("Young") and 5,294,845 ("McMahan"). In total, the examiner found 19 prior-art references. One was United States Patent No. 5,221,865 ("Phillips"). None was the '824 Michelsen Patent.

On July 29, 1997, the applicants amended proposed Claim 1 to require circuitry for varying the signal strength and slew rate of the output driver. They also amended Claim 6 as follows: "means for varying buffer drive strength *and slew rate* of the output devices in response to different load conditions for the buffer circuit" (Amendment dated July 29, 1997, at 3) (addition underlined). Still, no independent control over slew rate was claimed.

Furthermore, the applicants added proposed Claim 17. This claim read:

A system including an output buffer circuit for furnishing signals to a load comprising:

an output device for providing signals to the load;

logic circuitry for testing an amount of memory in the system; and

means for varying buffer drive strength of the output devices in response to the amount of memory in the system.

In their remarks, the applicants argued: "Claim 17 is not obvious over Young in view of McMahan. McMahan *does not teach logic circuitry for determining an amount of memory in the system and varying buffer drive strength in response to that determination*" (Amendment dated July 27, 1997, at 9) (emphasis added).

The examiner again rejected all the proposed claims on October 29, 1997. This time, the examiner stated that proposed Claims 1–4, 6, 8, and 9 were anticipated by United States Patent No. 5,663,664 ("Schnizlein"), and that the rest of the proposed claims were obvious in light of Schnizlein.

On March 10, 1998, the applicants filed a preliminary amendment adding "a logic circuit for calculating a load impedance" to proposed Claim 1 and "means for detecting different load conditions" to proposed Claim 6 (Amendment dated Mar. 10, 1998, at 2). Independent control over slew rate still was not claimed.

The first time independent slew-rate control was introduced into proposed Claim 1 was on June 5, 1998, almost three years after the date on fax header on the copy of the '824 Michelsen Patent produced from Mr. Johnston's files. The amendment was made in response to the attorney's earlier phone interview with the examiner. It added the following limitation to what was allowed as Claim 1: "a plurality of different current paths having different current carrying characteristics for providing a slew rate for the switching devices in response to the logic circuit indicating the load impedance" (Amendment dated June 5, 1998, at 2). The title of the invention was subsequently changed to "Output Buffer with Current Paths Having Different Current Carrying Characteristics for Providing Programmable Slew Rate and Signal Strength."

## ANALYSIS

Summary judgment is granted when there is no genuine issue of material fact and no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment is evaluated under the applicable evidentiary standard. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A defendant alleging that applicants withheld material prior art from the Patent and Trademark Office "must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir. 1995). "[P]roof of inequitable conduct may be rebutted by a showing that: (a) the prior art was not material . . .; (b) a showing that the applicant did not know of the art . . .; (c) a showing that the applicant did not know of its materiality; or (d) a showing that the applicant's failure to disclose the art did not result from an intent to mislead the PTO." *Elk Corp. of Dallas v. GAF Building Materials Corp.*, 168 F.3d 28, 30 (Fed.Cir.1999). Once a court has found materiality and intent, it must weigh the two and determine whether the conduct was "so culpable that the patent should be held unenforceable." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1319 (Fed.Cir. 2000). "The defense of inequitable conduct is entirely equitable in nature, and thus not an issue for a jury to decide." *Id.* at 1318.

### 1. Materiality.

Intel's opposition does not dispute that the '824 Michelsen Patent anticipated proposed Claims 1–3 and 6–8 in the original '651 patent application. Indeed, it clearly did. Proposed Claim 1 had three elements: "a first plurality of switching devices," a "second first plurality of switching devices," and "a source of signals for enabling selected ones of the first plurality of switching devices in response to output signals of a first value and for enabling selected ones of the second plurality of switching devices in response to output signals of a second value." Intel's expert conceded that the '824 Michelsen Patent disclosed a first and second "plurality of switching devices for connecting a voltage to an output terminal," the first two elements of proposed Claim 1 (Rhyne Dep. 270–71). While Intel's expert did not concede that the '824 Michelsen Patent disclosed the third element, the '824 Michelsen Patent taught generating "enable signals" EN1 and EN2 based on a circuit "designed to detect the actual number of cards in the expansion slots of the computer" (Col.5:66–6:2) or "a software routine run to determine how much system memory (memory parts 17) are installed" (Col.6:64–66). The enable signals EN1 and EN2 in the '824 Michelsen Patent, like the signals EN0 and EN1 in the '651 patent, can be used to selectively enable transistors in the output driver (Col.5:41–6:6). They are plainly covered by the broad language "source of signals for enabling" in proposed Claim 1.

Proposed Claim 6 had two elements: (i) "a plurality of output devices for providing output signals to a load," and (ii) "means for varying buffer drive strength of the output devices in response to different load conditions for the buffer circuit." Intel's expert testified that the '824 Michelsen Patent disclosed "a plurality of output devices for providing output signals to a load," the first element of proposed Claim 6 (Rhyne Dep. 293). The '824 Michelsen Patent taught varying the drive strength according to the number of mem-

ory cards detected in the expansion slots (Col.5:67–6:6), which is a measure of load impedance.[5] Further, it explained that a purpose of the invention was to address impedance mismatches: "The enabling circuit devices, in turn, are controlled by manual or software controlled logic to select the number of CMOS circuits required for matching the load connected to the output terminal" (Col.2:59–62). It appears that proposed Claim 6 was likewise anticipated by the '824 Michelsen Patent. "A finding that a withheld reference anticipates a claim in a patent satisfies the most stringent standard of materiality." *Fox Indus., Inc. v. Structural Preservation Sys.*, 922 F.2d 801, 804 (Fed.Cir.1990).

## 2. Reconciling *A.B. Dick* and *Molins*

 Rather than dispute that the '824 Michelsen Patent anticipated proposed claims in the original patent application, Intel argues instead that the '824 Michelsen Patent was not material. It was not material, supposedly, because it was cumulative of other references later found by the examiner, specifically Phillips, which was found by the examiner during the first office action, and Schnizlein, which was found by the examiner during the second office action. Generally, a reference is material "if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327 (Fed.Cir.1998). "[A] patentee need not cite an otherwise material reference to the PTO if that reference is merely cumulative or less material than other references before the examiner." *Id.* at 1328. According to Intel, the '824 Michelsen Patent was cumulative because Phillips and Schnizlein taught varying slew rate in ad-

dition to varying drive strength, whereas the '824 Michelsen Patent only taught varying drive strength.

Intel argues that the applicants were free to withhold the '824 Michelsen Patent with impunity because the examiner discovered allegedly cumulative prior art almost two years later. Intel never cited any prior art. The applicants knew about the '824 Michelsen Patent for almost two years while prosecution was pending. During that period, the '824 Michelsen Patent was material to the then-pending claims. Moreover, after the first rejection, the applicants made an argument they arguably could not have made had the '824 Michelsen Patent been disclosed. It was not until the end of prosecution, when the examiner stumbled upon Schnizlein, that any arguably-cumulative reference was placed in the record.

 "PTO Rule 56 is the appropriate starting point in determining the threshold level of materiality." *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1440 (Fed.Cir.1991). At the time of the application, PTO Rule 56 stated: "The duty to disclose information exists with respect to each pending claim until the claim is canceled or withdrawn from consideration, or the application becomes abandoned." 37 C.F.R. 1.56(a) (1995). With regard to materiality, it provided: "Under this section, information is material to patentability when it is not cumulative to information *already of record* or *being made of record* in the application." 37 C.F.R. 1.56(b) (1995) (emphasis added). During the entire period before the first rejection, the applicants had a duty to disclose material information to the PTO because their claims were pending. There

**5.** The '651 patent states, for instance: "For example, the logic circuitry may test the amount of random access memory which is included in main memory within the system. The value of random access memory included in the system is a measure of load impedance . . ." (Col.3:33–37).

was no prior art in the record. Nor was any made of record. Failure to disclose the '824 Michelsen Patent, which anticipated proposed independent Claims 1 and 6, for this entire period was a breach of the duty of candor. This breach continued throughout the prosecution because the applicants never disclosed the '824 Michelsen Patent.

The foregoing law seems clear and not contested. The parties part company, however, over two divergent lines of Federal Circuit authority. One line favors application of the doctrine of unenforceability. The other does not.

In *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392 (Fed.Cir.1986), the applicants failed to disclose two articles they discovered shortly after they filed their application. After the claims had already been rejected once, the examiner found the withheld articles and used them to reject 14 proposed claims. The applicants then amended their claims and obtained allowance. The Federal Circuit upheld the district court's finding of unenforceability. It rejected the applicants' argument that their failure to disclose the articles was immaterial because the examiner had subsequently found the articles. Equally unavailing was their argument that they had amended claims in response to the examiner's rejection based on the withheld articles, which were later allowed.

On the other hand, in *Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed.Cir.1995), the applicant failed to cite prior art that the examiner soon found. In a 2–1 decision, the Federal Circuit held that this was not inequitable conduct, stating that since the examiner found and considered the references, they were "of record." *Id.* at 1185. The dissent noted that the majority had not addressed the holding of *A.B. Dick*. *Id.* at 1189 n. 7 (Nies, J., dissenting).

■ These two Federal Circuit decisions point in nearly opposite directions.

This Court reconciles these opinions as follows: *Molins* applies only if the art subsequently found by the examiner is exactly the art withheld. At oral argument, Intel took the position that an applicant could knowingly defraud the PTO and be completely absolved as long as the examiner happened to find other cumulative art. Patent prosecution, however, is an ex parte process. This one-sided process depends on applicants honestly disclosing material prior art known to them. As the Federal Circuit has explained:

> Inequitable conduct is an offense against the PTO and the public. The offense is committed most commonly by intentional failures to submit material references to an examiner, or by making knowing false or misleading statements to the examiner, such that it can confidently be said that by deceitful intent the patent prosecution process has been subverted. Although the conduct giving rise to judgments of unenforceability thus occurs before the examiner, the offense deserves its penalty because the processes of the PTO have been transgressed.

*Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1383 (Fed. Cir.1998). Under Intel's extreme view, the duty of candor and the important public policy it serves would be compromised. *Molins* cannot be extended without destroying *A.B. Dick*. Accordingly, *Molins* does not apply here because the examiner never found the '824 Michelsen Patent. An applicant who tries to defraud the PTO must assume the risk that the examiner will not find the art withheld. Such a fraudulent applicant should not be granted leeway to invoke "cumulative" references found by the examiner.

■ The '824 Michelsen Patent was clearly material. Had the examiner failed to find other references, the proposed

claims might well have been allowed. "A fortuitous rejection does not cure a breach of the duty of candor." *Fox Indus.*, 922 F.2d at 804 (citing *Driscoll v. Cebalo*, 731 F.2d 878, 885 (Fed.Cir.1984)). The proposed claims were pending for almost two years while the applicants were aware of the '824 Michelsen Patent. During this period, no prior art could have possibly rendered the '824 Michelsen Patent cumulative since none was in the record. The fact that the examiner rejected the proposed claims because he found other references does not excuse the applicants' failure to disclose the '824 Michelsen Patent before the first rejection.

Moreover, contrary to Intel's view, the '824 Michelsen Patent was not cumulative of Phillips. While Phillips taught a buffer in which the drive strength and slew rate could be varied, the Court is unaware of any teaching by Phillips that drive strength should be varied *according to the impedance of the load.* This was a key feature of the '651 patent that the applicants repeatedly emphasized in prosecution. Matching the buffer output to load impedance was also a key feature of the '824 Michelsen Patent. Because Phillips did not include this prominent teaching from the '824 Michelsen Patent, it was not cumulative. Indeed, the potential combination of the two references made the '824 Michelsen Patent all the more material.

The importance of Phillips' failure to teach varying drive strength according to load impedance can be seen in the fact that after the rejection in which the examiner found Phillips, the applicants added a claim for "logic circuitry for testing an amount of memory in the system; and means for varying buffer drive strength of the output devices in response to the amount of memory in the system" (Amendment dated July 27, 1997, at 6). In their remarks, the applicants argued that the reference cited by the examiner did "not teach logic circuitry for determining an amount of memory in the system and varying buffer drive strength in response to that determination" (*id.* at 9). In contrast, the '824 Michelsen Patent explicitly taught that "the drive level required on the output pad 15 may be determined by a software routine run to determine how much system memory (memory parts 17) are installed" (Col.6:63–66), or that drive strength could be varied according to "a circuit . . . designed to detect the actual number of cards in the expansion slots of the computer" (Col.5:67–6:1). The applicants' statement was directed at the McMahan reference. Nonetheless, this argument could not have been made if the '824 Michelsen Patent had been disclosed.[6]

Because Intel's expert testified that he had not formed any opinion as to whether the '824 Michelsen Patent was cumulative of any reference besides Schnizlein (Rhyne Dep. 317–318), the only evidence Intel relies on for its position that the '824 Michelsen Patent was cumulative of Phillips are statements by VIA. According to Intel, a chart submitted by VIA's expert demonstrates that the '824 Michelsen Patent was cumulative of Phillips because the chart shows that Phillips taught everything that the '824 Michelsen Patent taught and also taught independently controlling slew rate (Opp.3–4). The chart is unavailing. Under the column labeled "why sel. strength," under the row for Phillips, there is a blank (Intel Exh. 10). VIA's expert testified that he left this column blank

---

**6.** Making such an argument while withholding the '824 Michelsen Patent arguably violated PTO Rule 56. 37 C.F.R. 1.56(b)(2)(ii) (1995) ("information is material to patentability when . . . it refutes, or is inconsistent with, a position the applicant takes in asserting an argument of patentability").

because Phillips disclosed no reason for varying drive strength (Davidson Dep. 236–37). As already stated, tying the variation of drive strength to load impedance was a key feature of the '651 patent.

Intel also argues that VIA's claim charts state that Phillips contained every element of Claim 1 of the '651 patent (Intel Exh. 13, Tab 1 at 2–3). While perhaps inconsistent with the opinion of VIA's expert, the claim charts do not create a question of fact as to whether the '824 Michelsen Patent was cumulative of Phillips in light of a comparison of the two patents, the file wrapper, and the unrebutted expert testimony in the record.

This order does not reach whether the '824 Michelsen Patent was cumulative of Schnizlein. For the reasons already given, the applicants were under a duty to disclose the '824 Michelsen Patent before and after the first office action. They did not.

### 3. Knowledge of Materiality/Intent.

■ While circumstantial evidence of deceptive intent arguably exists here, summary judgment is not appropriate. On a motion for summary judgment, all inferences must be drawn in favor of Intel, the non-moving party. This order holds that questions of fact exist as to whether the inventors had the requisite intent for a finding of unenforceability.

■ Inequitable conduct requires a specific intent to deceive the examiner into granting a patent. *Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1312 (Fed. Cir.2000). Intent is rarely proven by direct evidence. *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274–75 (Fed.Cir. 2001). "[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead."

*Ibid.* Still, "materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Ibid.* (quotation omitted). "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Upjohn*, 225 F.3d at 1312 (quotation omitted). Mere gross negligence does not amount to intent to deceive. *Molins*, 48 F.3d at 1181. Finding deceptive intent "is peculiarly within the province of the fact finder that observed the witnesses." *Ibid.* (quotation omitted).

■ Knowledge of materiality and intent to deceive are separate inquiries. Here, however, these inquiries overlap because Mr. Johnston contends that he failed to disclose the '824 Michelsen Patent because he did not believe that it was material.

Mr. Johnston, like all inventors, signed an oath stating that he had read the claims and that he understood them (VIA Exh. 13). Additionally, he testified that he looked at the cover page of the '824 Michelsen Patent (Johnston Dep. 204). On the cover was the abstract, which called out that the '824 Michelsen Patent was directed to a buffer in which each of the output circuits was "selectively individually enabled or disabled to select the optimum number of output drive circuits which are operated in parallel to supply the drive signal ...." Reading the abstract should arguably have raised a red flag as to the '824 Michelsen Patent's materiality to at least proposed Claim 1. Additionally, the circuit diagram on the front page of the '824 Michelsen Patent, which depicted a variable-drive-strength buffer, likely should have warned him that the patent was material to his pending claims. Mr. Johnston is charged with knowing the law, *i.e.*, that he was required to disclose to the PTO any patent that a reasonable examin-

er would most likely consider important, much less one that anticipated claims in his patent application. *Brasseler, U.S.A., I, L.P. v. Stryker Sales Corp.,* 267 F.3d 1370, 1385 (Fed.Cir.2001).

On the other hand, Mr. Johnston testified that he did not remember whether he read the abstract (Johnston Dep. 204). There is a possibility that he simply looked at the '824 Michelsen Patent and put it in his file, as he testified. Whether he is to be believed is a question of fact. *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1259 (Fed.Cir.2000).

Similarly, Mr. Trieu's testimony that he did not know why Mr. Sambandan faxed him the '824 Michelsen Patent, but that he simultaneously wanted to make those involved with filing the application "more aware" of this information appears inconsistent. It does not, however, amount to intent to deceive as a matter of law.

The argument made in favor of proposed Claim 17 could suggest deceptive intent. Deceptive intent may "be shown where a patentee withheld references and made an argument for patentability that could not have been made had the art been disclosed." *GFI,* 265 F.3d at 1274–75. The Court is additionally troubled by attorney Szepesi's cavalier attitude and the fact that all three inventors knew about the '824 Michelsen Patent but never disclosed it. Their failure to disclose any prior art whatsoever at any point in the prosecution in a very crowded field, where the examiner found more than 25 references, is also disturbing. Despite this circumstantial evidence, all inferences still must be drawn in Intel's favor at the summary-judgment stage, and summary judgment cannot be granted.

VIA argues that *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182 (Fed.Cir.1993), supports finding the '651 patent unenforceable at the summary-judgment stage. In *Paragon,* the court upheld a summary judgment of unenforceability because the applicants withheld material sales information and, in response to the examiner's request for affidavits from neutral third-parties, instead submitted affidavits from stockholder consultants, who averred that they had never worked for and had no interest in Paragon. To avoid summary judgment, Paragon submitted declarations from the inventor and attorney who prosecuted the patent attesting to "their good faith and lack of deceptive intent." *Id.* at 1191. The court held: "If a bare declaration of lack of intent to mislead where a false material affidavit is submitted to the PTO were to raise a genuine issue, summary judgment would be precluded in all cases except where no response at all is made. However, such declaration amounts to no more than would a conclusory denial in a pleading." *Ibid.* The instant case is distinguishable. *First,* unlike *Paragon,* no glaringly false affirmative misrepresentation was made to the PTO. *Second,* more than a "bare declaration" exists here. There is deposition testimony from the inventors and a possible factual basis for their failure to disclose Michelsen to the PTO. *Paragon* is inapposite.[7]

## CONCLUSION

To summarize, this order holds:

1. The '824 Michelsen Patent was material even though the examiner subsequently discovered other possibly-cumulative references.

---

7. At oral argument, VIA also contended that *Brasseler, USA, I, L.P. v. Stryker Sales Corp.,* 267 F.3d 1370 (Fed.Cir.2001), supports granting summary judgment. In *Stryker,* however, the trial court held a hearing on intent. *Id.* at 1376.

2. The only issues left regarding inequitable conduct are whether the applicants knew that the '824 Michelsen Patent was material, whether they intended to deceive the PTO, and whether their conduct was so culpable that the '651 patent should be held unenforceable.

3. VIA's motion for summary judgment is otherwise **DENIED** and Intel's cross-motion is **DENIED.**

4. The issue of intent will be tried to the Court during trial. At the pretrial conference, the Court will decide whether this issue will be tried first and decided before the remainder of the trial. Counsel should state their views on this issue in the pretrial statements. Despite the order of non-infringement, this issue is not moot because VIA seeks a declaration that the patent is unenforceable.

**IT IS SO ORDERED.**