**AVENTIS PHARMACEUTICALS, INC., Merrell Pharmaceuticals, Inc., and Carderm Capital L.P., Plaintiffs,**

v.

**BARR LABORATORIES, INC., Impax Laboratories, Inc., Teva Pharmaceuticals, Usa, Inc., Mylan Pharmaceuticals, Inc., Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc., Defendants.**

Nos. CIV.A.01–3627(JAG), CIV.A.02–1322(JAG), CIV.A.03–487(JAG), CIV.A.03–1179(JAG), CIV.A.03–1180(JAG).

United States District Court, D. New Jersey.

Sept. 20, 2004.

---

■■■■■■■■■■■■■

---

Gerald Sobel, Esq., Joel Katcoff, Esq., David K. Barr, Esq., Kaye Scholer LLP, New York City, Tricia B. O'Reilly, Esq., Liza M. Walsh, Esq., Connell Foley LLP, Roseland, NJ, for Plaintiffs Aventis Pharmaceuticals Inc., Merrell Pharmaceuticals Inc., and Carderm Capital, L.P.

Richard S. Gresalfi, Esq., Stephen J. Lee, Esq., Kenyon & Kenyon, New York City, Allyn Z. Lite, Esq., Lite, DePalma, Greenberg & Rivas, LLC, Newark, NJ, for Defendant Impax Laboratories, Inc. and Teva Pharmaceuticals USA, Inc.

Glenn J. Pfadenhauer, Esq., George A. Borden, Esq., Bonnie Dunninger Nathan, Esq., Williams & Connelly, LLP, Washington, DC, Robert M. Goodman, Esq., C. Brian Kornbrek, Esq., Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP, Woodbridge, NJ, for Defendant Barr Laboratories, Inc.

E. Anthony Figg, Esq., Elizabeth A. Leff, Esq., Rothwell, Figg, Ernst & Manbeck, Washington, DC, Arnold B. Calmann, Esq., Jeffrey Soos, Esq., Saiber, Schlesinger, Satz & Goldstein, LLC, Newark, NJ, for Defendant Mylan Pharmaceuticals, Inc.

Thomas G. Roth, Esq., Law Offices of Thomas G. Roth, West Orange, NJ, Thomas C. Pontani, Esq., Martin B. Pavane, Esq., Alfred H. Hemingway, Jr., Esq., Cohen Pontani Lieberman & Pavane, New York City, for Defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc.

**AMENDED OPINION**

GREENAWAY, District Judge

This matter comes before the Court on the motion of Barr Laboratories, Inc. ("Barr"), Impax Laboratories, Inc. ("Impax"), Teva Pharmaceuticals USA, Inc. ("Teva"), Mylan Pharmaceuticals, Inc. ("Mylan"), Dr. Reddy's Laboratories, Ltd., and Dr. Reddy's Laboratories, Inc. ("Reddy"), (collectively "Defendants"), seeking summary judgment on their claim that U.S. Patent No. 5,738,872 ("the '872 patent") is invalid as anticipated, and that the '872 patent, as well as U.S. Patent Nos. 6,113,942 ("the '942 patent"), 5,855,912 ("the '912 patent"), 5,932,247 ("the '247 patent"), and 6,039,974 ("the '974 patent") are not infringed.[1] For the reasons set forth below, the summary judgment motion of non-infringement of the '912, '942, and '247 patents is granted. The motion as to the '974 patent is denied. A ruling on the '872 patent is reserved pending a *Markman* hearing to assist this Court in construing the patent's product-by-process claims. The scope of the *Markman* hearing shall be set forth below.

**BACKGROUND**

This dispute concerns patents owned by Aventis Pharmaceuticals, Inc., Merrell Pharmaceuticals Inc., and Carderm Capital L.P. (collectively "Plaintiffs" or "Aventis") disclosing solid dosage fexofenadine formulations sold in the United States by Aventis under the tradenames ALLEGRA® and ALLEGRA–D®. These antihistamine allergy medication products have achieved substantial commercial success in the United States. Between May 2001 and November 2002, Defendants each filed Abbreviated New Drug Applications ("ANDA") seeking the Federal Drug Ad-

---

1. The '942, '912, and '872 patents are asserted against defendants Barr, Impax, Teva, Mylan, and Reddy. The '974 patent is asserted against defendants Barr, Impax, and Mylan. The '247 patent is asserted against defendant Barr.

ministration's ("FDA") approval to market generic drug products containing the same active ingredients (fexofenadine hydrochloride ("fexofenadine") and pseudoephedrine hydrochloride) as Aventis' ALLEGRA® and ALLEGRA–D® products.[2] In connection with their ANDA submissions, Defendants filed so-called "Paragraph IV Certifications" asserting that the Aventis patents[3] were invalid, unenforceable, or would not be infringed by the commercial manufacture, use, or sale of their drug products.[4] In response to notice of Defendants' Paragraph IV Certifications, and acting pursuant to statutorily prescribed procedures,[5] Plaintiffs commenced these, now consolidated, patent infringement actions.

Defendants have filed the instant motions for summary judgment arguing that their accused products do not literally infringe the '942, '912, '274, and '974 patents, and further, that there can be no finding of infringement under the doctrine of equivalents. Defendants contend that Plaintiffs are barred from asserting the doctrine of equivalents by prosecution history estoppel, and in the alternative, are precluded from relying on the doctrine of equivalents because Plaintiffs' patents have dedicated inert ingredients or excipients used by Defendants in their accused products to the public. With respect to the '872 patent, Defendants argue that their accused products do not infringe, and that the '872

**2.** Barr filed ANDA No. 76–169 with the FDA on May 11, 2001, ANDA No. 76–191 on June 21, 2001, and ANDA No. 76–236 on September 14, 2001, Impax filed ANDA No. 76–298 with the FDA on December 13, 2001, Mylan filed ANDA No. 76–538 with the FDA on November 8, 2002, Teva filed ANDA No. 76–447 with the FDA on June 28, 2002. Dr. Reddy filed ANDA No. 76–502 with the FDA on November 26, 2002.

**3.** This Court's analysis is limited to U.S. Patent Nos. '872, '942, '912, '247, and '974, although additional patents, owned by Plaintiffs, were listed in Defendants' ANDA submissions.

**4.** The Federal Food, Drug and Cosmetic Act, also codified under the Drug Price Competition and Patent Term Restoration Act, or the Hatch–Waxman Act, provides a process where a generic pharmaceutical manufacturer may file an ANDA to obtain expedited approval for a generic drug that is the equivalent of a drug previously approved by the FDA pursuant to the New Drug Application process. *See* 21 U.S.C. § 355(j). The ANDA applicant must include a certification for each of the patents equivalent to the previously approved "pioneer drug," stating:

(I) that such patent information has not been filed [a "Paragraph I" Certification];

(II) that such patent has expired [a "Paragraph II" Certification];

(III) the date on which such patent will expire [a "Paragraph III" Certification];

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted [a "Paragraph IV" Certification]. 21 U.S.C. § 355(j)(2)(A)(vii).

Pursuant to 21 U.S.C. § 355(j)(5)(B)(iii), when an ANDA is submitted with a Paragraph IV Certification concerning a listed drug, "approval [by the FDA] shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (2)(B)(i) is received." Pursuant to the statute, the FDA must suspend approval of the ANDA until the earliest of the expiration of the pioneer patent, judicial resolution of the correctness of the ANDA applicant's certification, or thirty months from the receipt of notice.

**5.** Pursuant to the Hatch–Waxman Act Amendments, a company that includes in its application a Paragraph IV Certification must notify the original patent holder of its challenge. Once notification is received, the statute provides the owner of the challenged patent the right to initiate a patent infringement suit against the ANDA applicant within 45 days. 21 U.S.C. § 355(j)(5)(B)(iii).

patent is invalid, as anticipated by the prior art.

This Court will address infringement issues initially with respect to the '942, '912,'274, and '974 patents, followed by a focus on the inquiry into the validity of the '872 patent.

## APPLICABLE LEGAL STANDARDS

### I. FED. R. CIV. P. 56(c)

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994); *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990); *see also* FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir.1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences—including on issues of credibility—in favor of the non-moving party. *Watts v. Univ. of Del.*, 622 F.2d 47, 50 (3d Cir.1980).

### II. Infringement

The test for patent infringement requires a two step analysis: "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993). "In order for a court to find infringement, the plaintiff must show the presence of every limitation or its substantial equivalent in the accused device." *KX Industries*, 18 Fed.Appx. 871, 875, 2001 WL 902507, *3 (Fed.Cir.2001)(citing *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed.Cir.1994)). Although claim construction is an issue of law, the determination of infringement is a question of fact. *Id.*

"A district court should approach a motion for summary judgment on the fact issue of infringement with great care."

*Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 528 (Fed.Cir.1996). Nonetheless, summary judgment of infringement may be granted when a rational jury could only conclude that infringement has occurred. *See Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974–75 (Fed.Cir. 1999).

## INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

■ A product may infringe a patent either literally or equivalently. *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1459 (Fed.Cir.1998). Plaintiffs cannot argue that each limitation of the claims at issue in patents '942, '912, '274, and '974, are satisfied exactly by the accused products, as required to prove literal infringement. Instead, they rely on the doctrine of equivalents which "prevents an accused infringer from avoiding liability for infringement by changing only minor or insubstantial details of a claimed invention while retaining the invention's essential identity." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 564 (Fed.Cir.2000)("*Festo VI* "). Infringement under the doctrine of equivalents is found "only when a patentee shows by a preponderance of the evidence that the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

Application of the doctrine of equivalents requires a fact intensive analysis to determine whether or not differences between a claim limitation of the patent, and the corresponding element of the accused device, are merely insubstantial or unimportant substitutions. In certain cases, however, the law restricts application of the doctrine of equivalents without further fact finding. This occurs when a patentee is found to have dedicated equivalent subject matter to the public, or where prosecution history estoppel bars application of the doctrine of equivalents.

■ The '912, '942,'974, and '247 patents generally claim fexofenadine formulations with certain combinations of excipients, including pregelatinized starch, croscarmellose sodium, and microcrystalline cellulose. These excipients are not present in Defendants' accused product formulations.[6] For the purposes of this motion, it is assumed that defendants Barr, Impax, Teva, and Mylan's accused tablets substitute povidone, and Reddy substitutes mannitol as an equivalent for pregelatinized starch as a binder; Barr and Mylan substitute crospovidone, and Impax substitutes sodium starch glycolate for croscarmellose sodium as a disintegrant; and Barr and Reddy substitute powdered cellulose for microcrystalline cellulose as a diluent.

## PROSECUTION HISTORY ESTOPPEL

**I. Standard for the Bar of Prosecution History Estoppel to Availability of the Doctrine of Equivalents in an Infringement Action**

■ Prosecution history estoppel may bar a patentee from asserting infringement under the doctrine of equivalents:

> [T]here are limits to the application of the doctrine of equivalents aside from the question of insubstantiality of the differences ... [P]rosecution history estoppel can prevent a patentee from rely-

---

**6.** As a defendant need only prove one claimed element is missing from its accused product in order to avoid a finding of infringement, the parties have focused their arguments on these excipients. However, Defendants contend that other excipients, claimed in the Aventis patents, are also not present in their accused products.

ing on the doctrine of equivalents when the patentee relinquishes subject matter during the prosecution of the patent, either by amendment or argument. *Eagle Comtronics, Inc. v. Arrow Commun. Labs., Inc.*, 305 F.3d 1303,1315 (Fed.Cir. 2002). There are thus two different kinds of prosecution history estoppel: that based on amendment, and that based on argument.

### A. *Amendment–Based Estoppel*

■ The Supreme Court established the standard for amendment-based estoppel in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002)("*Festo VIII* "). The basic principle is: "[a] narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel." *Id.* at 736, 122 S.Ct. 1831. A patentee making such an amendment is presumed to have surrendered the territory for purposes of the doctrine of equivalents, and bears the burden of rebutting this presumption.

> [W]e hold here that the patentee should bear the burden of showing that the amendment does not surrender the particular equivalent in question. The patentee, as the author of the claim language, may be expected to draft claims encompassing readily known equivalents. A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim.

*Id.* at 740, 122 S.Ct. 1831. The Court held that there are three ways in which a patentee may rebut this presumption:

> The equivalent may have been unforeseeable at the time of the application; the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or there may be some other reason suggesting that the patentee could not rea-

sonably be expected to have described the insubstantial substitute in question. *Id.* Even if estoppel applies, however, the patentee may demonstrate that the narrowing amendment did not surrender the particular equivalents at issue. *Id.* at 741, 122 S.Ct. 1831. "The standard for determining whether particular subject matter was relinquished is an objective one that depends on what a competitor reasonably would conclude from the patent's prosecution history." *Mark 1 Marketing, Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed.Cir.1995).

■ The issue of whether prosecution history estoppel bars the availability of the doctrine of equivalents in an infringement action is a matter of law. "We have stated on numerous occasions that whether prosecution history estoppel applies, and hence whether the doctrine of equivalents may be available for a particular claim limitation, presents a question of law." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367 (Fed.Cir.2003)("*Festo IX* "). Any resolution of factual issues underlying these questions of law may be decided by the court, not the jury. *Id.* at 1369.

### B. *Argument–Based Estoppel*

■ The Federal Circuit has extended the principles of prosecution history estoppel to arguments made by an applicant during patent prosecution, producing a second category of estoppel: argument-based estoppel. "Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed.Cir.1995). "To invoke argument-based estoppel, the prosecution history must evince a clear and unmistakable surrender of subject matter." *Eagle Com-*

*tronics,* 305 F.3d at 1316. Thus, the legal standards for amendment-based estoppel and argument-based estoppel differ greatly.

## II. Prosecution History Estoppel Does Not Bar Availability of the Doctrine of Equivalents in Plaintiffs' Action for Infringement of the '974 Patent

 The '974 patent is for a two-layer tablet, with one layer of antihistamine (from the genus of which fexofenadine is one species) and another layer of decongestant. Defendants make only one argument relating to the examiner's statements in the office action allowing the claims: "[h]aving failed to contest the P.T.O.'s stated reasons for allowance, Plaintiffs have disallowed any broader constructions." (Impax Br. at 20). That single sentence contains Defendants' entire argument on this matter.[7] Defendants propose no legal theory to explain why Plaintiffs have disallowed any broader constructions. They cite no case law, and their reply brief does not even discuss the '974 patent. Non-response to a statement in an office action does not qualify for consideration as either amendment-based estoppel or argument-based estoppel. Defendants have failed to show a basis for their claim.

## III. Prosecution History Estoppel Bars Availability of the Doctrine of Equivalents in Plaintiffs' Actions for Infringement of the '942 and '912 Patents

Both Plaintiffs and Defendants agree that the written descriptions of the '942 and '912 patents are virtually identical, and do not differ materially for the purposes of this summary judgment motion. Plaintiffs and Defendants have argued the two patents together, and they are considered together in this opinion.

### A. Prosecution History of the '942 and '912 Patents

The '942 and '912 patents descended from three related applications: 1) application 08/395,952 was filed on February 28, 1995, and abandoned, but continued in part by 2) application 08/552,287, filed on December 12, 1995, and abandoned, but continued in part by 3) application 08/943,460 for the present patents, filed October 3, 1997. The '912 patent was granted directly from the last-mentioned application, and the '942 patent is a divisional offspring of that application.

The claims in the first application, 08/395,952, are all pharmaceutical composition claims for a combination of an active ingredient and one or more inert ingredients. The record shows that the P.T.O. response to the first application, the first office action, was directed to the generic nature of the claims, finding that they encompassed a plurality of species, and seeking restriction or election of species. (Gresalfi Decl. at A270—272.) Applicants responded by electing the species of fexofenadine, with a group of specific inert ingredients (croscarmellose sodium, microcrystalline cellulose, lactose, pregelatinized starch, gelatin and magnesium stearate), for a group of the claims. (Gresalfi Decl. at A274.) The P.T.O. then responded by reiterating the restriction requirement for the claims that did not involve the elected formulation, and it rejected the claims involving the elected formulation as anticipated and/or obvious. (Gresalfi Decl. at A278–281).

The applicants then filed the second application, 08/552,287, as a continuation-in-part of the first. The claims in the second application were of two types: most were pharmaceutical composition claims which varied from very broad and generic formu-

---

7. The '974 patent is asserted against defen-

dants Barr, Impax, and Mylan.

lations to very specific formulations, while some were product-by-process claims. The P.T.O. responded by again seeking restriction/election for some claims and rejecting others under 35 U.S.C. §§ 102(b) and 103 (Gresalfi Decl. at A385–A390). The examiner's comments in this first office action are nearly identical to the comments in the first office action for the first application. Applicants then cancelled all claims except for the product-by-process claims, and added new composition claims for fexofenadine formulations with specific inert ingredients (croscarmellose sodium, microcrystalline cellulose, lactose, pregelatinized starch, and gelatin; some formulations also included magnesium stearate). (Gresalfi Decl. at A392–A394.)

At this point, a significant change occurred in the specification of inert ingredients. As originally filed, claims in the second application referred specifically to the inert ingredients croscarmellose sodium, lactose, microcrystalline cellulose, pregelatinized starch, gelatin, calcium carbonate, magnesium stearate, and sodium starch glycolate. (Gresalfi Decl. at A355–A366.) The applicant cancelled all claims which specified the inert ingredients calcium carbonate and sodium starch glycolate, and added claims not specifying those two inert ingredients. Those two inert ingredients did not appear in the third application (08/943,460), nor are they specified in the claims in either the '942 or '912 patents. This is a crucial point in the prosecution history for this dispute, and the discussion below will focus on those events.

The P.T.O. next reexamined this group of old and new claims and rejected all of them as obvious over prior art, focusing on the particular inert ingredients croscarmellose sodium, microcrystalline cellulose, lactose, pregelatinized starch, and gelatin. (Gresalfi Decl. at A404.) Applicants filed a reply to this rejection, arguing, in brief, that the combinations of fexofenadine with the particular inert ingredients were not obvious from the prior art. (Gresalfi Decl. at A407–410.) The P.T.O. responded by reversing its rejection and allowing the previously rejected claims. Nonetheless, the applicants abandoned the application.

The applicants then filed the third application as a continuation of the second, adding some new claims, but essentially restricting the patent to the specific formulations claimed in the amended second application. These claims were allowed. The '912 patent was granted directly from the third application, and the '942 patent is a divisional offspring of that application.

### B. Narrowing Amendments Were Made for Reasons of Patentability of the '942 and '912 Patents

■ The parties do not dispute that the applicant made narrowing amendments during the prosecution history of the '942 and '912 patents. The applicant had previously eliminated most claims with generic formulations when, in response to the first office action to the second application, the applicant cancelled the claims with the remaining generic references to inert ingredients. From this point on, the application contained only claims with combinations of specific inert ingredients. At this point, then, the claim amendments narrowed their scope.

The focus of the parties' dispute here is the actual reason for the narrowing amendments. Plaintiffs argue that the applicants made narrowing amendments *not* for reasons of patentability, but to comply with the examiner's election/restriction requirements. Defendants argue that the narrowing amendments were made for reasons of patentability.

Plaintiffs argue that they cancelled the claims in response to the election/restriction requirements, not in response to the rejections for patentability. This argu-

ment must fail for several reasons, but the simplest is that it does not match the facts. In the first office action to the second application, the examiner rejected claims 1—10, 14—17, 22—24, 29, and 31—35 under 35 U.S.C. §§ 102(b) and 103; the examiner determined that claims 11—13, 18—21, 25—28, 30, and 36—43 were subject to restriction/election requirements. (Gresalfi Decl. at A385.) Claims 1 and 3 were the broadest claims. The examiner rejected Claims 1 and 3 and the applicant then cancelled the claims. Plaintiffs cannot maintain that they cancelled these broad claims in response to a restriction requirement. The prosecution history clearly shows that they were cancelled due to a rejection, and thus necessarily for reasons of patentability. This analysis alone defeats Plaintiffs' argument.

In addition, the Federal Circuit has held that a series of narrowing applications may form the basis for a finding of surrender of claim coverage. In *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 292 (Fed.Cir.1995), *cert. denied*, 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996), the patentee "chose to file continuing applications with successively narrower claims in lieu of otherwise responding to the P.T.O.'s rejections," and the Court held that the patentee had surrendered claim coverage. To argue here that the patentees filed a series of narrowing claims, in the context of repeated rejections for reasons of patentability, but that the narrowing claims were *not* filed for reasons of patentability, is far-fetched.

 Moreover, even if one were to assume, *arguendo*, that the changes were made only because of the restriction/election requirements, Plaintiffs assert incorrectly that such an action would preclude the application of prosecution history estoppel. Plaintiffs argue, in effect, for a *per se* rule that restriction requirements and requests for election of species cannot in-

voke prosecution history estoppel. Yet the Federal Circuit has not established a *per se* rule; rather, it has held that whether restriction requirements invoke prosecution history estoppel depends on the prosecution context in which they occur. *Merck & Co. v. Mylan Pharms., Inc.*, 190 F.3d 1335 (Fed.Cir.1999).

Plaintiffs erroneously cite *Merck* as authority for its argument, but, in *Merck,* the Federal Circuit rejected Merck's argument that an election of species cannot invoke prosecution history estoppel. Considering the entire prosecution context in which the election of species occurred, the Court held that the election of species was actually in response to a patentability rejection, and it found narrowing amendments giving rise to prosecution history estoppel. *Id.* at 1341. Thus, this Court may consider whether the amendments stemming from the restriction requirements and requests for election of species give rise to prosecution history estoppel.

This, however, is not the basis for this Court's finding of prosecution history estoppel; rather, as discussed above, the history shows clearly a narrowing amendment made to avoid a rejection under 35 U.S.C. §§ 102(b) and 103. Given that the applicant made a narrowing amendment for reasons of patentability, under *Festo VIII*, this gives rise to the rebuttable presumption that the patentee surrendered the equivalents in question.

C. *Plaintiffs Have Failed to Rebut the Presumption of Surrender of the Equivalents in Question*

1. *Sodium Starch Glycolate*

 Examination of the history of the second application reveals that the applicant did obviously surrender one of the equivalents at issue, sodium starch glycolate. As noted above, this inert ingredient was specified in claims initially made in the

second application, but, after those claims were cancelled, never appeared in any claims again. This is an unmistakable surrender of an equivalent in question, sodium starch glycolate.

At oral argument, Plaintiffs made one argument in an attempt to show that the applicant had not surrendered this equivalent: Plaintiffs argued that, because sodium starch glycolate and calcium carbonate always appeared together in the prosecution history, they surrendered only the combination of sodium starch glycolate and calcium carbonate. (Nov. 3, 2003,Tr. at 68–69.) Plaintiffs offered no cases or logic to sustain this argument. Sodium starch glycolate and calcium carbonate are clearly two discrete chemicals. The prosecution history manifests a clear surrender of the two chemicals individually; Plaintiffs have offered no persuasive justification for viewing them as a combination.

*2. Povidone, Corn Starch, Mannitol, Crospovidone, and Powdered Cellulose* [8]

■ The prosecution history does not manifest this same kind of clear surrender of the other inert ingredients at issue. At no point in the entire prosecution history do any claims mention povidone, corn starch, mannitol, crospovidone, or powdered cellulose. Nor does the rationale for claim rejection in the first office action make explicit reference to these ingredients or to the topic of inert ingredients. While the March 27, 1997, office action does reject claims for reasons involving obviousness of particular inert ingredient formulations, the applicant's reply convinced the P.T.O. to reverse this rejection,

and so it should not figure into this analysis.

The burden is on Plaintiffs to rebut the presumption that the applicant surrendered these equivalents. Plaintiffs have attempted rebuttal of this presumption using two of the kinds of arguments articulated in *Festo VIII*, tangential relation and unforeseeability.

The recent ruling by the Federal Circuit in *Festo IX* raises the possibility that Plaintiffs are foreclosed from successfully arguing tangential relation. The Court held that "an amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim." *Festo IX*, 344 F.3d at 1369. Because there is no further discussion of this point, it is unclear whether this represents an absolute rule, or a holding tailored to the facts of the case.

This principle speaks directly to this prosecution history because the prior art references *do* contain four of the exact equivalents in question (povidone, crospovidone, corn starch, and mannitol).[9] Amendments made to avoid that prior art therefore could not be considered tangentially related to the equivalents in question. While it does sound like an absolute rule, such a view is not consistent with the approach the Federal Circuit has generally taken, nor is it consistent with the case that the court cites as authority for the principle, *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352 (Fed.Cir. 2003). In general, and in *Pioneer*, the Federal Circuit has examined the prosecu-

---

8. Plaintiffs appear to have changed positions on the issue of whether they consider corn starch to be an equivalent in question. In their initial opposition brief, Plaintiffs specified corn starch as an equivalent. (Aventis' Opp'n. Br. at 22, 50.) Plaintiffs' last opposition brief listed the equivalents in question and did not include corn starch. (Aventis' Supp. Mem. in Opp'n. at 6.)

9. Applicant's reply (Gresalfi Decl. at A397–398) to the first office action for the second application states that the examiner cited a prior art reference containing four exact equivalents in question. Conte International Patent Application No. WO 95/01781. (Suppl. Kambic Decl. at Ex. 5).

tion history in detail in order to comprehend the rationale for amendments made to avoid prior art. In *Pioneer*, the court held: "The amendment was clearly not tangential to the equivalent in question; the amendment was made to avoid the very prior art that contained the equivalent." *Id.* at 1357. Because Plaintiffs have not persuaded this Court of a tangential relation, however, this Court need not decide whether this principle from *Festo IX* poses an insurmountable obstacle to them.

Plaintiffs make five arguments to persuade the Court that the amendments were only tangentially related to the equivalents in question, but none is convincing:

1) *The examiner did not reject any claims because the prior art disclosed Defendants' equivalents.*

This argument fails for two reasons. First, the examiner did not explain exactly how the claims were anticipated by, or obvious over, the prior art, so the Court cannot rule out the possibility that the examiner made the rejection on this basis. Second, and more importantly, this is not the test established by the Federal Circuit in *Festo IX*: the test does not refer to whether an equivalent is mentioned in the office action, but whether it is mentioned in the prior art references.

2) *The applicants did not mention the equivalents in prosecuting the application.*

Again, as above, this argument fails because it is irrelevant to the test established in *Festo IX*.

3) *None of the prior art references discloses a solid fexofenadine formulation.*

This argument simply makes no sense, as it is not directed at the issue of the equivalents used in prior art references.

4) *While prior art references describe using povidone as a binder, none do so in fexofenadine formulations, and so this fact was not germane to the stated reasons for rejection.*

This argument actually works against Plaintiffs. The fact that the examiner listed quite a few prior art references which did not contain fexofenadine suggests that the examiner may have been concerned not with the active ingredient, but with the inert ingredient components of these references. Thus, the examiner may well have rejected claims to avoid the specific inert ingredients in the prior art. The choice of inert ingredient could have been central to the examiner's rejection.

5) *Powdered cellulose is not listed in any of the prior art references, and mannitol is not used as a wet granulation binder in those formulations, so the amendments could only be tangentially related to those equivalents.*

While it is true that the Gowan reference European Patent Application No. 0,636,364,A1 (Suppl. Kambic Decl. at Ex. 11), explicitly lists cellulose, rather than powdered cellulose, not finding the equivalent in a prior art reference is not sufficient to rebut the presumption of surrender. The argument fails with regard to mannitol because, even if the reference uses the mannitol in a different way, this does not meet the burden of showing a tangential relation.[10]

10. Plaintiffs argued as well that the equivalents were not foreseeable at the time of application, but this argument cannot succeed. As discussed in detail in the section of this opinion on dedication, at least with respect to povidone and crospovidone, these excipients were not merely foreseeable at the time of application, they were, in fact, foreseen as equivalents and included either expressly, or by reference to the Pharmacopeia, in the patent specifications. Plaintiffs have failed to

Plaintiffs next try to further argue that discovery should be allowed in order to develop a factual record on foreseeability. This argument has no basis in law and runs contrary to the principles of *Festo IX*. In *Festo IX*, the Federal Circuit held that determining whether an equivalent was unforeseeable "presents an objective inquiry." *Festo IX*, 344 F.3d at 1369. The Federal Circuit makes plain that such an objective inquiry looks into the state of the art, *not* into the facts of the case. As such, this is not a matter for which discovery is appropriate.

### D. *The Prosecution History Does Not Support a Finding of Argument– Based Estoppel*

Defendants did not offer a specific argument-based estoppel analysis, but mixed prosecution arguments with narrowing amendments in one general analysis. In doing so, they overlook that the analyses involve very different legal standards. Defendants must show that the arguments made during prosecution manifest a clear and unmistakable surrender of subject matter. The arguments Defendants point to do not manifest any surrender of subject matter, no less a clear and unmistakable one. (Impax Br. at 7.) Given that Plaintiffs have failed to rebut the presumption of surrender in the amendment-based estoppel inquiry, this Court need not address in detail Defendants' points on argument-based estoppel.

In sum, the prosecution history of the '942 and '912 patents shows narrowing amendments made for reasons of patentability. Plaintiffs have failed to rebut the presumption of surrender of the equivalents in question, and are barred from using the doctrine of equivalents in their present actions for infringement of the '942 and '912 patents.

### IV. Prosecution History Estoppel Bars Availability of the Doctrine of Equivalents in Plaintiffs' Actions for Infringement of the '247 Patent.

### A. *Prosecution History of the '247 Patent*

The '247 patent shares the beginning prosecution history of the '942 and '912 patents: all three began with first application 08/395,952 (" '952 application") and second application 08/552,287 (" '287 application"). The history for this patent then branches off: applicant filed third application 08/742,166 (" '166 application") as a division of the second application. A division of the third application resulted in the fourth application 08/948,005 (" '005 application"), which matured into the '247 patent.

The prosecution history of the '247 patent has many similarities to that of the '942 and '912 patents, as it began with a common application with broad generic formulation claims and ended with a patent claiming—like the '942 and '912 patents—defined formulations of fexofenadine and specific inert ingredients. As with the '942 and '912 histories, the parties do not dispute that the '247 prosecution history shows narrowing amendments.

### B. *Narrowing Amendments Were Made for Reasons of Patentability of the '247 Patent*

█ Plaintiffs argue that the prosecution history of the '247 patent differs crucially from the histories of the '942 and '912 patents in that the '247 patent resulted from divisional applications of the original applications, while the '942 and '912 patents resulted from continuation applications.

rebut the presumption by arguing unforesee-

ability.

Plaintiffs cite *Biogen, Inc. v. Berlex Labs.*, 318 F.3d 1132, 1141 (Fed.Cir.2003) for the proposition that estoppel from the history of a parent application does not generally arise in regard to a divisional application with claims that differ from those of the parent. This argument suffers from two major flaws. First, *Biogen* concerns argument-based estoppel, not amendment-based estoppel. Its holding is inapplicable in the present analysis of amendment-based estoppel. Second, even setting aside Plaintiffs' lack of basis in law for their argument, the claims in the divisional applications were not for inventions that differed from those of the parent. The '247 history began with generic pharmaceutical formulation claims for the present invention and ended with specific formulation claims. Any argument based on the proposition that these claims represent different inventions must fail.

The prosecution history reveals narrowing amendments made for reasons of patentability. One notable feature of this patent's history is that the applicant submitted its third application, '166, on the same day, November 1, 1996, that it submitted a request to cancel and amend claims in that application. Thus, the history shows that it received the first office action for the '287 application on October 8, 1996, and then promptly filed the third '166 application as a division of the second '287 application, simultaneously canceling claims. The Federal Circuit dealt with a similar history in *Mark I*, 66 F.3d at 285, and held that an applicant cannot avoid the application of estoppel by filing a continuation application instead of responding to rejections. The court reasoned that:

> Mark I chose to file continuing applications with successively narrower claims in lieu of otherwise responding to the P.T.O.'s rejections, but an estoppel is not avoided by failing to respond to a rejection and instead meeting the substance of the rejection by filing a narrower continuing application. Rather, the prosecution history must be viewed as a whole to determine whether and what subject matter was surrendered to procure issuance of the patent.

*Id.* at 292.

In the present case, the applicant filed a series of applications with successively narrower claims in the context of multiple interrelated applications with multiple rejections. Viewing the prosecution history as a whole, the applicant clearly made narrowing amendments to secure the patent. Moreover, the Federal Circuit has considered the prosecution history of related patents and applications broadly. Most importantly, it has specifically applied the holding of *Mark I* to prosecution histories involving divisional applications. *See Desper Prods. v. QSound Lab.*, 157 F.3d 1325, 1339 (Fed.Cir.1998). It has even found estoppel from the prosecution history of one patent to apply to a different patent stemming from the same original application. *See Jonsson v. Stanley Works*, 903 F.2d 812, 817 (Fed.Cir.1990). In *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed.Cir.1999), the court held that "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." These cases manifest an approach that considers the prosecution histories of related applications and patents broadly and inclusively, avoiding purely formalistic distinctions such as that between a continuation and a divisional application.

C. *Plaintiffs Have Failed to Rebut the Presumption of Surrender of the Equivalents in Question*

The equivalents in question in the action for infringement of the '247 patent are

powdered cellulose, mannitol, crospovidone, and povidone. Plaintiffs made no new arguments to rebut the presumption of surrender of the equivalents in question in their action for infringement of the '247 patent, relying on the arguments made with regard to the '942 and '912 patents. The Court has considered those arguments above and determined that Plaintiffs have failed to rebut the presumption of surrender. Because the amendment-based estoppel analysis results in a finding that prosecution history estoppel bars use of the doctrine of equivalents in the action for infringement of the '247 patent, the Court need not address the parties' argument-based estoppel dispute.

## DEDICATION

As an alternative ground for their summary judgment motion, Defendants contend that subject matter that was disclosed but not claimed in the '942, '912, '974 and '247 patents is "dedicated to the public" and therefore cannot fall within the scope of equivalency. This Court is satisfied that prosecution history estoppel bars Plaintiffs from asserting sodium starch glycolate, povidone, mannitol, crospovidone, powdered cellulose, and corn starch as equivalents for excipients in the '912,- '942 and '247 patents. However, this Court will consider Defendants' dedication arguments in full to determine the application of the doctrine of equivalents to the '974 patent, to which prosecution history estoppel does not apply, and as further support for a finding that the equivalents in question have been surrendered in the '912, '942, and '247 patents.

## I. Standard for the Bar of Dedication to Availability of the Doctrine of Equivalents in an Infringement Action (The Johnson & Johnston Case)

In March 2002, the Federal Circuit issued an en banc, per curiam opinion in *Johnson & Johnston v. R.E. Service Co.*

*Inc.*, 285 F.3d 1046 (Fed.Cir.2002). In *Johnson & Johnston*, the plaintiff held a patent for a component used in the manufacture of printed circuit boards. The patent described a laminate comprised of copper foil adhered to a stiffer substrate of aluminum. The substrate served to make the copper foil easier to handle without damage in the manufacturing process. The patent specification described the preferred composition of the substrate material as aluminum, but noted that, "[w]hile aluminum is currently the preferred material for the substrate, other metals, such as stainless steel or nickel alloys, may be used." *Id.* at 1050. The claims, however, only recited the use of a substrate sheet of aluminum.

The defendant made a similar product that used steel as the substrate sheet, and not aluminum. The defendant argued that their product was not infringing because the plaintiff had dedicated the use of steel to the public, by describing it in the patent specification as an alternative to aluminum, but not claiming it in the claims. The Federal Circuit agreed, and held that "when a patent drafter discloses but declines to claim subject matter ... this action dedicates unclaimed subject matter to the public." *Id.* The *Johnson & Johnston* decision imposes a strict application of the dedication rule in its articulation of the primacy of the claims in defining the scope of a patentee's exclusive rights. *Johnson & Johnston* affirmed the principle that "[o]ut of all the possible permutations of elements which can be made from the specifications, [a patentee] reserves for himself only those contained in the claims." *Id.* (citing *Milcor Steel Co. v. George A. Fuller Co.*, 122 F.2d 292, 294 (2nd Cir. 1941)).

## II. The Instant Case

The '942 and '912 patents both claim a pharmaceutical composition consisting of a

piperidinoalkanol compound and certain inert ingredients including croscarmellose sodium (a superdisintegrant), pregelatinized starch (a binder), and microcrystalline cellulose (a cellulose diluent). (Gresalfi Decl. at A18, A53). The "written description" of the patent specifications identify inert ingredients that can be present in amounts of up to 95% of the total pharmaceutical composition weight.

As used herein the term "inert ingredient" refers to those therapeutically inert ingredients that are well known in the art of pharmaceutical science which can be used singly or in various combinations ... as are disclosed in The United States Pharmacopeia, XXII, 1990 ... pages 1857–1859, which is incorporated herein by reference. For example, the following inert ingredients can be utilized singly or in various combinations; binders such as ... pregelatinized starch, povidone...; disintegrants such as microcrystalline cellulose, croscarmellose sodium ... sodium starch glycolate ... pregelatinized starch and the like; preferred disintegrants are croscarmellose sodium ... pregelatinized starch and sodium starch glycolate with croscarmellose sodium being the most preferred disintegrant .... The above inert ingredients can be present in amounts up to about 95% of the total composition by weight. (Gresalfi Decl at A8.) [11]

While identified in the specifications, the inert ingredients povidone, crospovidone, and sodium starch glycolate are not claimed. Mannitol and powdered cellulose are not expressly cited in the specifications, but are listed in the U.S. Pharmacopeia incorporated in the specification by reference.

The '974 patent claims a bilayer tablet, with one layer containing a formulation of a decongestant such as pseudoephedrine, and the other layer containing a formulation of an antihistamine such as fexofenadine. Each claim of the patent sets forth a composition containing a cellulose diluent, pregelatinized starch, a "suitable disintegrant," and a "suitable lubricant" in varying amounts by weight. (Gresalfi Decl. at 33.) The patent specifications state that the composition "optionally" may contain one or more other pharmaceutically acceptable excipients. Povidone as well as crospovidone are listed as examples. (Gresalfi Decl. at 27.)

The '247 patent claims a capsule formulation of a piperidinoalkanol compound and certain inert ingredients including pregelatinized starch, croscarmellose sodium, and microcrystalline cellulose. The patent specifications set forth povidone and crospovidone with identical language as that used in the '912, and '942 patents. These excipients are not claimed.

## III. The Parties' Contentions

■ Defendants argue that the '942,'912, '974 and '247 patents (variously) disclose the inert ingredients sodium starch glycolate, povidone, crospovidone, mannitol, corn starch, and powdered cellulose in their specifications, but do not claim them. The patents, therefore, have dedicated those ingredients to the public, and under *Johnson & Johnston,* Plaintiffs cannot now reclaim subject matter which has been disclosed.

Plaintiffs make several arguments in an attempt to distinguish the present case from *Johnson & Johnston.* First, Plaintiffs argue that the dedication to the public doctrine only applies when a patentee fails to claim an *alternative embodiment* of the patentee's invention that is disclosed in the patent specifications, not individual elements in isolation. Plaintiffs claim that the specifications for the patents at issue

---

11. Language in the '942 patent, here cited, is identical to language in the '912 patent.

merely recite a list of excipients, some of which are contained in the accused products, but do not disclose the accused products in their entirety as a discrete embodiment. In support of their proposition, Plaintiffs cite *Maxwell v. Baker*, 86 F.3d 1098 (Fed.Cir.1996), a Federal Circuit case in which a plaintiff was barred from asserting the doctrine of equivalents where they had disclosed an alternate embodiment of their shoe attachment system invention in the written specifications, but did not recite the embodiment in the claims.

■ Plaintiffs' argument fails because the dedication doctrine encompasses unclaimed subject matter, which includes not only unclaimed embodiments, but also unclaimed elements and limitations. The *Johnson* court held that the plaintiff could not invoke the doctrine of equivalents to extend its claimed *limitation* of the substrate material, namely aluminum, to also encompass steel, where the use of steel as a substitute for aluminum had been disclosed but not claimed. "Having disclosed without claiming the steel substrates, Johnston cannot now invoke the doctrine of equivalents to extend its aluminum limitation to encompass steel." *Id.* at 1055. Moreover, the Federal Circuit in *Johnson* overruled *YBM Magnex Inc. v. Int'l Trade Comm'n*, 145 F.3d 1317 (Fed.Cir.1998), a case which purported to limit the application of the dedication rule to instances where a patent disclosed an unclaimed alternative embodiment distinct from the claimed invention. By overruling *YBM Magnex*, the *Johnson and Johnston* court rejected this narrowing of the dedication

doctrine.[12] *See also PSC Computer Products Inc. v. Foxconn International Inc.*, 355 F.3d 1353, 1356 (Fed.Cir.2004)(affirming district court finding of dedication where patentee disclosed alternative "parts" of invention, while failing to claim them).

In an extension of the embodiment argument, Plaintiffs claim that in order for the dedication rule to apply, the patents at issue must describe Defendants' accused products' specific formulations (i.e., combinations and amounts of ingredients), citing to district court cases (namely, *Astra v. Andrx*, 222 F.Supp.2d 423 (S.D.N.Y.2002) and *Upjohn v. Mova*, 951 F.Supp. 333 (D.P.R.1997), *aff'd in part and rev'd in part*, 225 F.3d 1306 (Fed.Cir.2000)), in which courts failed to find that dedication occurred where the patent specifications for biochemical formulations did not disclose the specific combination and amounts of ingredients used in the accused products. The cases cited by Plaintiffs which this Court is not, in any event, bound to follow, at most stand for the narrow proposition that where patent specifications have disclosed alternative subject matter (here, ingredients) in specific amounts and combinations without claiming them, dedication is limited to subject matter within the parameters (e.g., amounts) set forth in the specifications. There is no apparent conflict between this premise, and a finding of dedication in this instance. The '912, '942, and '247 patent specifications describe the excipients povidone, crospovidone, and sodium starch glycolate as ingredients that may be present in the pharmaceutical com-

---

**12.** This Court also finds it significant that the doctrine of equivalents analysis "must be applied to individual elements of the claim, not to the invention as a whole." *Warner–Jenkinson Co. Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). " 'Element' may be used to mean a single limitation ..." *Corning Glass v. Sumi-*

*tomo Elec. U.S.A. Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989). To the extent that the dedication doctrine resolves whether a patentee may rely on the doctrine of equivalents, it would seem illogical to determine that the dedication doctrine cannot be applied to individually disclosed elements.

position in an amount up to 95% by weight. Assuming Defendants' products contain any one or a combination of these excipients in amounts equal to or less than 95%, Defendants' accused products' formulations have in fact been described by the Aventis patent specifications. This Court sees no reason to read limitations into what subject matter has been dedicated beyond what is plainly disclosed in the specifications.

The Federal Circuit's recent opinion in *PSC Computer Products Inc.*, provides further guidance. In *PSC*, the patentee argued that its disclosure of plastic in the written description section of its patent for a heat assembly clip, as an alternative material for the strap portion of the clip, was neither as precise nor clear as the disclosure in *Johnson*, and consequently, should be distinguished from that case. The written description in the patent at issue stated, "[o]ther prior art devices use molded plastic and/or metal parts that must be cast or forged which again are more expensive metal forming operations." *Id.* at 1360. The Federal Circuit affirmed the district court's finding that this disclosure was in fact sufficiently 'specific' to constitute dedication of the alternative use of plastic parts to the public. This language was distinguished from the 'generic'

disclosure, "other resilient materials may be suitable for the strap," which was also written in the description section of the patent. The court rejected the patentee's argument that only language as clear as the *Johnson* or the *Maxwell* disclosures is sufficient to dedicate subject matter to the public. *Id.* at 1358. In so ruling, the court underscored the public notice function of patent claims and stated,

> The ability to discern both what has been disclosed and what has been claimed is the essence of public notice. It tells the public which products or processes would infringe the patent and which would not. Were the patentee allowed to reclaim some specifically-disclosed-but-unclaimed matter under the doctrine of equivalents, the public would have no way of knowing which disclosed matter infringed and which did not.

*Id.* (citing *Festo IX*).

Under *PSC* and *Johnson*, Plaintiffs' argument that the mere listing of excipients in the patents' specifications do not teach substituting Defendants' specific excipients for those set forth in the claimed formulations must also fail.[13] The proper inquiry is whether one of ordinary skill in the art could identify which subject matter has been disclosed and which subject matter

---

**13.** Plaintiffs further claim that it "makes no sense" to say that they have dedicated excipients that are already in the public domain, as evidenced by their publication in the U.S. Pharmacopeia. (Aventis Opp'n. Br. at 45–46.) It is not material whether those equivalents are in the public domain and well-known. The doctrine of equivalents should only be applied where the patentee could not have foreseen a variation that copyists could employ to evade the literal limitations of the claim. "[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure." *Sage Prods. Inc. v. Devon Indus., Inc.*, 126 F.3d

1420, 1425 (Fed.Cir.1997). With respect to the Aventis patents, the disclosed ingredients are clearly foreseeable equivalents to the ingredients claimed, specifically *because* they have been described as equivalents by the patent drafter himself, and moreover are described as "well known in the art of pharmaceutical science." (Gresalfi Decl. at A8, col. 13.) "[T]he patentee has an obligation to draft claims that capture all reasonably foreseeable ways to practice the invention." *Johnson* at 1057 (Rader J., concurring). The doctrine of equivalents cannot be used to "rescue" a claim drafter who has not put potential infringers on notice that foreseeable equivalents to elements in the invention have been claimed. *Id.*

has been claimed. *Id.* ("We thus hold that if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public."); *see also Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1108 (Fed.Cir.1996)(finding dedication where a person of ordinary skill in the art would conclude that the patentee dedicated to the public an alternative to the subject matter that was claimed). The excipient povidone is set forth in the '912, '942, and '247 patents' specifications in a list of excipients described as "binders," along with the claimed excipient pregelatinized starch, as an *example* of an ingredient that can be used in the composition. Crospovidone and sodium starch glycolate are similarly disclosed as disintegrants, in the same list as the claimed excipient croscarmellose sodium, designated as the "most preferred" disintegrant. The plain language of the patent specifications makes clear that the unclaimed excipients belong to the same class of therapeutically inert ingredients as those claimed, and moreover, that they can be used in the composition. The facts presented are analogous to those in *Johnson and Johnston,* and this Court must reach the same conclusion as did the Federal Circuit in that case. By disclosing but not claiming povidone, crospovidone, and sodium starch glycolate, the patents have dedicated these ingredients to the public, and cannot now reclaim these excipients through application of the doctrine of equivalents.

The Court's analysis differs, however, with respect to the ingredients mannitol, corn starch, and powdered cellulose.[14] These ingredients are not expressly recited in any of the patents' specifications. Rather, mannitol and powdered cellulose are listed on page 1858 of the U.S. Pharmacopeia, incorporated in the patent specifications by reference.[15] These ingredients are not cited in the list of excipients following the sentence, "[f]or example, the following inert ingredients can be utilized ..." (Gresalfi Decl. at A43.) Rather, the pharmacopeia reference appears in the sentence, "As used herein the term 'inert ingredient' refers to those therapeutically inert ingredients that are well known in the art of pharmaceutical science which can be used singly, or in various combinations ... as are disclosed in the United States Pharmacopeia...." *Id.*[16] As compared to the ingredients that are expressly cited, there is no explicit language specifying that mannitol, powdered cellulose, or corn starch can be present in the invention in a particular compositional amount (e.g. up to 95% of the composition by weight). It appears to this Court that the ingredients incorporated by reference are set forth to define the term "inert ingredient."[17] The mere description of ingredients belonging to the class "inert ingredient," without a clearer indication that any ingredients so described are equivalents to the claimed excipients, does not constitute a clear or specific disclosure of subject matter such that a person of ordinary skill in the art would conclude, by reading the specifica-

14. As discussed *supra,* mannitol and corn starch are used by defendant Reddy and powdered cellulose is used by defendants Reddy and Barr.

15. While the ingredient 'starch' and 'pregelatinzed starch' appear in the referenced pharmacopeia pages, the ingredient 'corn starch' does not appear at all.

16. Language in the '912 patent, herein cited, is identical to language in the '942 and '247 patents.

17. This Court does not find that material incorporated by reference can never constitute dedicated subject matter.

tion, that the patentee has dedicated the use of these ingredients to the public as alternatives to those claimed.

The '974 patent disclosure of excipients which can "optionally" be included in addition to the claimed excipients, similarly fails to give rise to the conclusion that these excipients were dedicated as equivalents to those claimed. The '974 patent states, "Formulation (A) and (B) of the pharmaceutical compositions of the present invention optionally may contain one or more other pharmaceutically acceptable excipients." (Gresalfi Decl. at A27.) Povidone and crospovidone are listed as such "other" excipients. In *Johnson & Johnston*, the disclosed element was clearly identified as an alternative to the claimed element, although a disfavored one. This Court is not presented with analogous facts in this instance.

For these reasons, the Court finds that the '912, '942, and '247 patents have dedicated the excipients povidone, crospovidone, and sodium starch glycolate to the public. On this basis, and because of prosecution history estoppel, Plaintiffs cannot now claim these ingredients as equivalents to those claimed. Although this Court finds that mannitol, corn starch, and powdered cellulose have not been dedicated to the public by any of the patents at issue, Plaintiffs are precluded from relying on the doctrine of equivalents by prosecution history estoppel, and cannot now assert these excipients as equivalents to claimed excipients in the '912, '942, and '247 patents. Finally, this Court finds that the '974 patent does not dedicate the excipients povidone and crospovidone to the public. As there has been no finding of

prosecution history estoppel, Plaintiffs may assert these excipients against Barr, Impax, and Mylan[18] as equivalents to those claimed.

## THE '872 PATENT

The '872 patent describes a fexofenadine hydrochloride drug formulation. Plaintiffs allege that claims 1 and 2 of the '872 patent are infringed by Defendants' accused products. These independent claims are product-by-process claims. Product-by-process claims are not specified in the statutes governing patents. This category of claims is a judicial construct that evolved from a recognition that, due to the limitations of language, some products may be described only by the process used to make them.[19]

The composition of claims 1 and 2 of the '872 patent include a diluent, a disintegrant, and a binding agent, while the composition of claim 2 also includes a lubricant.

Claim 1 reads:

Claim 1: A pharmaceutical composition prepared by a wet granulation process comprising, preparing the wet granulation wherein a compound of formula: [graphic] wherein X is a number ranging from about zero to 5, and the individual optical isomers thereof, a diluent and a disintegrant are mixed with a solution of a binding agent; the wet granulation is screened, the wet granulation is dried, and the dry granulation is screened.

(Gresalfi Decl. at A72.)

Claim 2 is identical to Claim 1, except instead of reciting that "the dry granula-

---

18. As discussed, *supra,* the '974 patent is asserted only against defendants Barr, Impax, and Mylan. Defendants Barr and Mylan's accused products contain povidone and crospovidone, defendant Impax' accused product contains povidone.

19. For a further discussion of product-by-process claims, *see generally,* Richard A. Anderson and Lawrence A. Hymo, *Product–by–Process Claims: Time for Reexamination,* 3 Fed. Cir. B.J. 131 (1993).

tion is screened," it recites that "the dry granulation is combined with a lubricant." *Id.*

Defendants argue that their products do not infringe, and that claims 1 and 2 of the '872 patent are invalid for anticipation by the prior art under 35 U.S.C. § 102(b).[20] Defendants assert that U.S. Patent Nos. 4,929,605 ("the '605 patent"), 4,996,061 ("the '061 patent"), 6,037,353 ("the '353 patent"), 5,375,693 ("the '693 patent"), and 4,254,129 ("the '129 patent") are anticipating prior art references. Plaintiffs argue that the '872 patent is valid because the prior art references do not disclose each limitation of claims 1 and 2 of the '872 patent, as they must to anticipate, and that Defendants' products infringe the claims, either literally or under the doctrine of equivalents.

## I. Legal Standards

### A. *Claim Construction*

In *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), the Federal Circuit articulated the basic legal principles of claim construction. Claim construction is a matter of law and is exclusively the province of the court. *Id.* at 976–77. "[T]he focus in construing disputed terms in claim language … is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Id.* at 986.

"To ascertain the meaning of claims, we consider three sources: the claims, the specification, and the prosecution history. Expert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used." *Id.* at

979 (internal citations omitted). A hearing on issues of claim construction is known as a *Markman* hearing.

### B. *Anticipation*

A claim is invalid for anticipation if a single prior art reference published more than a year before the patent application was filed discloses each and every limitation set forth in a claim, either expressly or inherently. *In re Schreiber*, 128 F.3d 1473, 1477 (Fed.Cir.1997). Patents are presumed valid under 35 U.S.C. § 282. Consequently, when challenging the validity of a patent, the burden is on the defendant to establish each element of invalidity by clear and convincing evidence. "[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed.Cir. 2001).

In *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565 (Fed.Cir.1991), the Federal Circuit articulated the basic legal rules for establishing anticipation to invalidate a patent. "Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference. There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." Id. at 1576 (internal citations omitted).

Anticipation is a question of fact. To make such finding on summary judgment, the court must determine that no facts material to the question are disputed; or that even if all material factual inferences are drawn in favor of the non-

---

**20.** "A person shall be entitled to a patent unless -

(b) the invention was patented or described in a printed publication in this or a foreign country or in a public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).

movant, there is no reasonable basis on which the non-movant can prevail. The standard of proof that would have to be met at trial must be considered.

*Id.* (citations omitted).

Thus, to invalidate the '872 patent for anticipation by prior patents, this Court must find that even if all material factual inferences are drawn in favor of Plaintiffs, there is no reasonable basis on which Plaintiffs can prevail.

### C. Enablement

 A prior art reference must be enabling to anticipate. *Amgen Inc. v. Hoechst Marion Roussel,* 314 F.3d 1313, 1355 (Fed.Cir.2003). The accused infringer is entitled to a presumption of enablement of claimed and unclaimed material in a prior art patent. *Id.* The patentee bears the burden of presenting evidence to convince the court that the prior art patent did not enable the invention, and thus, that it is not anticipating. *Id.* In the instant case, then, Plaintiffs bear the burden of presenting evidence that the prior art patents do not enable the '872 inventions.

 Determination of whether a prior art reference is enabling "is a legal conclusion based upon underlying factual inquiries." *Johns Hopkins Univ. v. CellPro, Inc.,* 152 F.3d 1342, 1354 (Fed.Cir.1998). "[T]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experi-

mentation." *In re Wright,* 999 F.2d 1557, 1561 (Fed.Cir.1993). In *Johns Hopkins,* the Federal Circuit performed a detailed analysis of the evidentiary requirements for succeeding at summary judgment on enablement. The evidence must be viewed in the light most favorable to the non-moving party (in this case, Plaintiffs.) *Id.* at 1359. At trial, Plaintiffs would have "to prove by clear and convincing evidence facts establishing a lack of enablement." *See id.* Plaintiffs must present evidence that does more than simply raise doubt regarding enablement; they must show "that a material factual dispute existed, i.e., a dispute upon which a reasonable jury could have resolved enablement in [the non-moving party's] favor after a review of the entire record." *See id.* If the evidence presented is not "significantly probative, summary judgment may be granted." *See id.*

### II. Discussion

As an initial matter, this Court must address the threshold question of whether product-by-process claims are limited to the product prepared by the process set forth in the claims. In other words, do the process limitations of claims 1 and 2 of the '872 patent limit the scope of the claims? In *Scripps,* 927 F.2d at 1583, the Federal Circuit held that "the correct reading of product-by-process claims is that they are not limited to product prepared by the process set forth in the claims." [21] *See also In re Thorpe,* 777 F.2d

---

**21.** A different panel of the Federal Circuit decided *Atlantic Thermoplastics Co. v. Faytex Corp.,* 970 F.2d 834 (Fed.Cir.1992), approximately a year after the *Scripps* decision and explicitly declined to follow *Scripps,* holding that process terms in product-by-process claims *do* serve as limitations in determining infringement. Under Federal Circuit law, "where there are conflicting precedents, the earlier precedent controls." *See DeKalb v. Northrup King Co.,* 1997 WL 587492,*2 (N.D.Ill.1997)("applying [the Federal Cir-

cuit's] conflict rule, the court will apply *Scripps*..."); *Trustees of Columbia Univ. v. Roche Diagnostics,* 126 F.Supp.2d 16, 32 (D.Mass.2000) ("When confronted with two panel opinions in direct conflict, the earlier decision is controlling."); *but see Tropix, Inc. v. Lumigen, Inc.,* 825 F.Supp. 7, 10 (D.Mass. 1993) ("It would appear to me, even in the confused state of the record, that a majority of the judges of the Federal Circuit would rule that *Atlantic* states the controlling law, and I so rule in this case.") Until the *Scripps* deci-

695, 697 (Fed.Cir.1985)("The patentability of a product does not depend on its method of production. If the product in a product-by-process claim is the same as or obvious from a product of the prior art, the claim is unpatentable even though the prior product was made by a different process.") [22]

 While product-by-process claims are not limited to the product prepared by the process set forth in the claims, process steps may establish product characteristics which are claim limitations. In an infringement or validity analysis, characteristics or product properties imparted by process steps recited in product-by-process claims are only relevant, however, to the extent that the resulting characteristics are claimed. Claims cannot be "saved" from invalidity by reading extraneous limitations not present in the

claims. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.1988); *see also SmithKline Beecham Corp. v. Geneva Pharms., Inc.*, 2002 WL 32350034, 2002 U.S. Dist. LEXIS 25275 (E.D.Pa.2002).

### A. *Incorporation by Reference in the '605 and '061 Patents*

 In their initial briefs, Defendants asserted that the '872 patent was anticipated by prior art patents '605 and '061. The '605 and '061 patents disclose a piperidinoalkanol formulation used in SELDANE® and SELDANE D®, antihistamine products once sold by Aventis. Plaintiffs argue that these prior art references do not anticipate patent '872, because they do not disclose fexofenadine compositions, a claimed element of the '872 patent.[23] Rather, both prior art refer-

sion is rejected by a hearing *en banc*, it is the precedential decision. While there is debate as to which case states the better rule, it is only the *en banc* Federal Circuit that can resolve the issue, which unfortunately they have not *yet* chosen to do. As the earlier panel opinion, *Scripps* is controlling and this Court will follow its reasoning. Defendants concede that this Court is bound to follow Scripps. "Under the Federal Circuit's rule, I think you're bound to follow Scripps .... [I] think at this point it would be in error for me to urge your Honor to do anything other than follow Scripps." (Dec. 8, 2003, Tr. p. 86.)

22. With respect to literal infringement, Plaintiffs argue that even if an infringement analysis required that the accused products meet all of the limitations of the claims, including the process steps (i.e., if *Atlantic* governs), Defendants' products still infringe. Defendants argue that their products do not perform the process step of screening the wet granulation as required in '872 claims 1 and 2, either literally or under the doctrine of equivalents. Plaintiffs submit the expert declaration of Dr. Chowhan arguing the contrary. (Chowhan Decl. ¶ 23.)

23. As further evidence that prior art patents '605 and '061 do not anticipate, Plaintiffs have submitted evidence that the product of

the '605 and '061 patents and the product of the '872 patent are not the same. (Chowhan Decl. ¶ 33). Specifically, Plaintiffs argue that the product of the '605 patent is required to have a carbonate salt and nonionic or cationic surfactant, and that the '061 patent requires calcium carbonate and one or more nonionic surfactants. These ingredients are not contained in the product of claims 1 and 2 of the '872 patent. (Aventis Br. at 37). Whether patent '872 contains these elements is irrelevant because a proper invalidation inquiry in the anticipation context only requires an assessment of whether the *prior art reference* discloses each and every limitation of the claimed invention. "Anticipation requires the presence in a single prior art reference disclosure of each and every element of the claimed invention, arranged as in the claim. In deciding the issue of anticipation, the trier of fact must identify the elements of the claims, determine their meaning in light of the specification and prosecution history, and identify corresponding elements disclosed in the allegedly anticipating reference." *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1458 (Fed.Cir.1984) (citations omitted).

ences claim compositions of a piperidinoal-kanol compound, and identify terfenadine, a type of piperidinoalkanol compound, as the preferred active ingredient. Although both prior art patents incorporate by reference patents which describe fexofenadine, or alternatively piperidinoalkanol compounds, Plaintiffs argue that this general incorporation by reference fails to meet requirements for a description necessary to anticipate.

Whether the prior art patents incorporate by reference the fexofenadine formulation, such that the '872 patent is anticipated, is a question of law for the court to decide. *See Advanced Display Systems v. Kent State University*, 212 F.3d 1272, 1283 (Fed.Cir.2000) ("Whether and to what extent material has been incorporated by reference into a host document is a question of law.")(citing *Quaker City Gear Works, Inc. v. Skil Corp.* 747 F.2d 1446 (Fed.Cir.1984)).

The '605 patent provides that "[t]he present invention relates to a pharmaceutical composition for oral administration of various piperidinoalkanol derivatives which are disclosed in U.S. patents Nos. 3,878,-217, 4,254,129, and 4,285,957, the full disclosures of each patent being incorporated by reference." (Gresalfi Decl. at A115.) The '061 patent states that "[p]iperidinoal-kanol derivatives which are useful as antihistamines are disclosed in U.S. Patents Nos. 3,878,217, 4,254,129, and 4,285,957 and these patents are incorporated herein by reference." (Gresalfi Decl. at A78.)

Defendants argue that the Court may consider the patents referred to in the quoted passage as incorporated into the '605 and '061 patents for purposes of the anticipation analysis.[24] This Court agrees. By their express language, these references bring within the four corners of

the anticipatory reference the relevant elements of the prior art. "Consideration of a reference within a reference is consistent with the established standards for determining anticipation." *Rheox, Inc. v. United Catalysts, Inc.*, 1995 WL 526542, *4 (D.N.J.1995); *see also Advanced Display*, 212 F.3d at 1282 ("Material not explicitly contained in the single prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document."). *Atari Games Corp. v. Nintendo*, 1993 WL 214886 (N.D.Cal.1993) and *In Re Saunders*, 58 C.C.P.A. 1316, 444 F.2d 599 (Cust. & Pat. App.1971), two cases cited by Plaintiffs which held that the asserted anticipating reference did not expressly incorporate another reference, are distinguishable. In those cases, the portions of the references claimed to be incorporated were not contained within the particular portions of the reference specified in the prior art. Here, the referenced patents are incorporated in their entirety. Moreover, the '605 and '061 patents refer specifically to these references for purposes of incorporating "piperidinoalkanol derivatives," fexofenadine being one such derivative.

B. *Plaintiffs Cannot Defeat Summary Judgment by Arguing that the Prior Art Does Not Enable a Bioavailable Formulation*

■ Plaintiffs further argue that even if patents '605 and '061 described the substitution of fexofenadine for terfenadine, they are not enabling because a person of ordinary skill in the field, directed to the prior art by the anticipatory reference, could not produce the invention. As described by Plaintiffs, the inventors of the '872 patent attempted to develop a fexofenadine tablet using the formulations

---

**24.** It should be noted that in their joint reply brief Defendants have asserted patent '129

itself as an anticipating prior art reference. (Def. Joint Reply Br. at 35–36.)

set forth in the '605 and '061 patents, by substituting fexofenadine for terfenadine, and omitting a pseudoephedrine decongestant. The formulation that was produced contained, but for the substitutions described, the same combination of excipients as the formulations set forth in the '605 and '061 patents. When the formulation was administered to patients it was shown that the bioavailability[25] of the formulation was unacceptably poor. Plaintiffs claim that the '605 and '061 patents, therefore, cannot be said to enable the "novel" fexofenadine formulations of the '872 patent which have excellent bioavailability.

Bioavailibility, a desirable characteristic in a biochemical formulation, is not set forth either expressly or inherently as a limitation in the '872 patent claims. For this Court to accept Plaintiffs' argument that the prior art need enable a bioavailable formulation in order to anticipate, we would have to disregard the clear warnings of the Federal Circuit against importing claim limitations based on terms not mentioned in the claim:

> It is improper for a court to add extraneous limitations to a claim, that is limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim. The danger of improperly importing a limitation is even greater when the purported limitation is based upon a term not appearing in the claim. "If we once begin to include elements not mentioned in the claim in order to limit such claim ..., we should never know where to stop."

*Amgen Inc. v. Hoechst Marion Roussel,* 314 F.3d 1313, 1325 (Fed.Cir.2003) (citations omitted).

In short, the prior art need not enable a *bioavailable* fexofenadine formulation in order to be deemed anticipating.

C. *Plaintiffs Cannot Defeat Summary Judgment by Arguing that the '129, '353, and '693 Patents do not Disclose the '872 Hydrochloride Salt Formulation*

■ In the event that the Court does not find that the '872 patent is anticipated by prior art patents '605 and '061, Defendants have also asserted the '353 patent, the '693 patent, and the '129 patent, as anticipating prior art references. (Def. Joint Reply Br. at 35–36.) Plaintiffs argue that the '129, '353 and '693 patents cannot anticipate claims 1 and 2 of the '872 patent because claims 1 and 2 of '872 require a form of fexofenadine called the hydrochloride salt, also called fexofenadine hydrochloride, while the '129, '353 and '693 patents do not disclose fexofenadine hydrochloride formulations.

Plaintiffs admit that, while the '129 and '693 patents do not claim the hydrochloride salt, they do disclose the hydrochloride salt in the specifications. (Aventis Supp. Br. on New References at 15 n. 8, p. 16 n. 10). Plaintiffs also admit that the '353 patent incorporates the '129 patent by reference. (Aventis Supp. Br. on New References at 15 n. 9.) Plaintiffs argue that the '129, '353, and '693 patents cannot anticipate '872, however; while they may disclose the individual ingredients, they do not disclose them together as fexofenadine hydrochloride formulations. This is, in essence, an argument about enablement: do the prior art patents enable the formulations of the '872 inventions? Do they teach one skilled in the art how to make and use the fexofenadine

---

**25.** "The term 'bioavailability' means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action." 35 U.S.C. § 355(j)(8)(A).

hydrochloride formulations claimed in '872?

Plaintiffs have failed to meet the evidentiary burden specified by *Amgen* to defeat summary judgment on the issue of whether the prior art patents are enabling. They rely only on the second declaration of Dr. Zak T. Chowhan, which does not squarely address the enablement issue. Dr. Chowhan states that the '129, '353, and '693 patents do not describe the fexofenadine formulation of the '872 patent, but this does not speak to the question of whether each prior art patent would enable one of ordinary skill in the art to make the '872 fexofenadine hydrochloride formulation. At oral argument, Plaintiffs could point to no other evidence which could be used to persuade a reasonable jury to resolve the enablement issue in Plaintiffs' favor. Plaintiffs thus fail in arguing that the '129, '353, and '693 patents do not anticipate '872 because they do not disclose the same fexofenadine hydrochloride formulation.

D. *Plaintiffs Cannot Defeat Summary Judgment by Arguing that the '872 Claim Language States a Limitation of Reduced Agglomerate Size*

■ Plaintiffs argue that claims 1 and 2 of the '872 patent require that the wet granulation be screened, and that this "imparts a distinguishing structural difference in the product of the claims," as compared to the product of patents '129, '353, and '693. (Aventis Supp. Br. on New References at 11.) Plaintiffs argue that the effect of this process step is to "reduce the size of large wet granulation agglomerates," and that this states a product limitation absent in the prior art patents (Aventis Supp. Br. on New References at 18, 19, 21.) Plaintiffs' argument is unpersuasive because the claim language of '872 says nothing about the size of particles or agglomerates; it has no express reference to the size of anything. Plaintiffs' "separate

disintegrant" argument addressed below is worthy of consideration because the claim expressly states the use of a disintegrant, and so it is conceivable that the patent has claimed a product limitation involving a disintegrant; here, however, there is no such express claim language regarding size, and so there is no language in the claim on which to base an inference that the patentee has claimed a size limitation.

Plaintiffs admitted at oral argument that the claim language did not express a clear or specific limitation:

> **The Court:** Right. So if I look at 19 and 20, what's the— and I'm obviously reading the claim, how would I read the claim to that particular size specification? It says physically reduce the size of larger agglomerates of the granule. I'm just looking at Dr. Chowhan.
>
> **Mr. Barr:** That's one skilled in the art. The pharmaceutical formulator makes a decision on whether the wet granulation is—has agglomerates in it and to reduce the size. And that's something defendants each do in the way by using—
>
> **The Court:** So any notion of particularized sizes is not relevant to this, it's just the fact through that process you can reduce the size?
>
> **Mr. Barr:** Yes, your Honor. (Dec. 8, 2003, Tr. at 77.)

Plaintiffs cannot reasonably argue that the claim language states a product limitation of reduced size, but without limitation as to size. Under *Amgen*, this Court is not permitted to import a limitation that does not appear in the claims.

E. *Plaintiffs Have Raised an Issue of Claim Construction: Do Claims 1 and 2 of the '872 Patent State a Product Limitation of a Separate Intragranular Disintegrant?*

■ Finally, Plaintiffs argue that claims 1 and 2 of the '872 patent "require

that the claimed product contain a separate disintegrant incorporated into the granules," and that the claim language thus states a product characteristic absent from any of the prior art references. (Aventis Br. at 37, Aventis Supp. Br. on New References at 10.) Plaintiffs have offered as evidence the second declaration of Dr. Zak T. Chowhan, which states that, in essence, in his expert opinion, claims 1 and 2 of the '872 patent state this product limitation. (See Chowhan Decl. at ¶¶ 13,-16, 20, 24.) Defendants argue the insufficiency of this declaration, but offer no evidence to counter it.

Plaintiffs argue that the process step quoted above establishes a product characteristic of a separate intragranular disintegrant, and offer the second Chowhan declaration as evidence that one of ordinary skill in the art would understand the claim language to mean this. This raises an issue of claim construction: do claims 1 and 2 state a limitation requiring that the product have the structural characteristic of a separate disintegrant incorporated into the granules? This Court must decide, as a matter of law, whether one of ordinary skill in the art would understand the claim phrase "a diluent and a disintegrant are mixed with a solution of a binding agent" to state a product limitation of a separate intragranular disintegrant.

Understanding the meaning of the claim language in regard to the chemical properties of the pharmaceutical product specified in claims 1 and 2 of the '872 patent requires technical expertise in pharmaceutical chemistry. To construe the claim language, this Court requires a *Markman* hearing directed to the question of whether claims 1 and 2 of the '872 patent require that the product have the structural characteristic of a separate disintegrant incorporated into the granules. After the *Markman* hearing, this Court will rule on the issue of claim construction, and pro-

ceed to address the motion for summary judgment of patent invalidity.

### CONCLUSION

Based on the above reasoning, this Court GRANTS Defendants' motion for summary judgment of noninfringement of the '912, '942, and '247 patents. Defendants' motion for summary judgment of noninfringement of the '974 patent is DENIED. A ruling on the '872 patent is reserved pending a *Markman* hearing to assist this court in construing the patent's product-by-process claims.